1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

11

12

13

14

15

16

17

18

19

20

21

STEPHANIE SEAGRAVES, an individual,
BELINDA BRONS, an individual,
BENJAMIN LUPO, an individual,
CHARLENE RAMIREZ, an individual,
JAMES WILSON, an individual, KRISTIN
ROWLAND, an individual, LAURA COOK,
an individual, MARY AHERN, an
individual, MICHELLE WHITLOW, an
individual, MELINDA ALEXANDER, an
individual, PAULENE DOUGHTERY, an
individual, SANDRA RUCH, an individual,
SPENCER MOOERS, an individual,
TAYLOR SCHRODT, an individual,
THERESA BEYERSDORFER BOGUE, an
individual, TONY LACEY, an individual,
TRACIE DUMAS, an individual, YVETTE
HESSLER, an individual,

**CASE NO. 3:24-cv-05081**

**COMPLAINT**

**JURY DEMANDED**

22

Plaintiffs,

23

v.

24

25

26

WASHINGTON DEPARTMENT OF
CHILDREN, YOUTH, AND FAMILIES, a
governmental agency, ROSS HUNTER, an
individual,

COMPLAINT

1

1
2

Defendants.

3

## I.    **INTRODUCTION AND SUMMARY**

4

1.    This civil rights action raises federal questions under the United States Constitution,

5

particularly the First and Fourteenth Amendments; the Civil Rights Act of 1871 and

6

1964, 42 U.S.C. § 1983, as well as the common laws of the State of Washington, the

7

Washington Law Against Discrimination (WLAD), Wash. Rev. Code 49.60 *et seq.,* and

8

state contract law.

9

2.    Plaintiffs are eighteen (18) Department of Children, Youth, and Families (DCYF)

10

workers who were wrongfully denied accommodations and terminated for non-

11

compliance with a new state requirement for COVID-19 vaccination, in violation of their

12

Constitutional and statutory rights. Plaintiffs come to this Court to be made whole.

13

3.    As discussed more fully *infra,* Defendants, motivated by religious animus, refused to

14

perform their jobs to hold individualized dialogue with each Plaintiff regarding their job

15

environment, duties, and circumstances as part of a legitimate accommodation process

16

prior to termination, a complete failure that can never be interpreted as being undertaken

17

in their official capacity nor reasonably believed to be the law they were sworn to uphold.

18

Defendants repeatedly refused to do their job through denied or ignored requests for

19

*Loudermill* hearings without discussion, denied requests for leave without pay until the

20

emergency passed without discussion, denied continued telework despite its success for

21

18 months prior without discussion, denied continued successful use of personal

22

protective equipment (PPE) without discussion, denied consideration for Plaintiffs who

23
24
25
26

COMPLAINT                                    2                    **ARNOLD & JACOBOWITZ PLLC**

worked alone or in expansive workspaces where social distancing was attainable without discussion, denied Plaintiffs' pleas that they would pay for their own testing and masks without discussion, and claimed the Proclamation forbid anyone to enter Department facilities without vaccination and without exception or accommodation, which was not the law.

4.    Defendants also failed to identify any undue hardship associated with Plaintiffs' accommodation because Defendants never engaged in any individualized discussion with any of the Plaintiffs. Defendants admittedly relied on job descriptions in lieu of an interactive dialogue to effectuate their discriminatory practice, a reliance not in conformity with the law. Many of those job descriptions were outdated or inaccurate, and regardless, Defendants never identified to any Plaintiff the "essential function" of their job that could not be performed remotely but made a blanket statement that their essential job functions could not be accommodated. This was a pretext for discrimination through termination.

5.    Defendants manufactured a false standard – "eliminate the risk" – Plaintiffs had to fulfill in order to keep their jobs, a standard not applied to other secular employees who reinfected and continued to spread the virus, a standard found nowhere in the Proclamation, EEOC or DOH guidance or the law they were sworn to uphold. Without authority and with religious animus, Defendants created their own mandate within a mandate and added to the Proclamation, which they had no authority to do.

6.    And finally, each Defendant knew at the time of Plaintiffs' terminations that the vaccine failed to prevent transmission and infection and was, in fact, never tested for such. With

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

this failure of the vaccine to stop transmission or infection – the stated purpose of the Proclamation – Defendants failed to consider accommodations that were likely more effective in stopping the spread of the virus, such as PPE. Further, the demand to take a still experimental medical treatment or lose employment is not Constitutionally permissible.

7.  Defendant Hunter acted in both his official and personal capacity in violating Plaintiffs' constitutional and civil rights, acting outside the scope of his employment in his personal capacity motivated by religious animus for which there is no immunity.

8.  Each Defendant performed acts of personal bias and discrimination against all Plaintiffs in violating their constitutional rights by acting in conflict with and outside the scope of the authority granted by, the Proclamation, *see Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689-91, 69 S. Ct. 1457 (1949); *see also United States v. Yakima Trial Court,* 806 F.2d 853, 859 (9th Cir. 1986), where the Ninth Circuit held that any time a government agent commits an unconstitutional act, the agent is necessarily acting outside the scope of authority. Thus, unconstitutional acts are outside the scope of a government agent's official capacity. *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1332-33 n.3 (9th Cir. 1987).

## II.   PARTIES

9.  Defendant Washington State Department of Children, Youth, and Families (DCYF) is a governmental agency of the State of Washington.

10. Defendant Ross Hunter, Secretary of the Department of Children, Youth and Families, is an employer, officer, vice principal and/or agent for purposes of Wash. Rev. Code §

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

49.52.070. Defendant Hunter personally participated in and performed the acts and omissions complained of herein outside the scope of his official capacity in order to advance his career and/or for the personal benefit and the benefit of his marital community.

11. Plaintiff Stephanie Seagraves was a Fiscal Analyst II who was granted a religious exemption to the vaccine but denied an accommodation and was terminated on October 18, 2021. Ms. Seagraves was able to perform her job 100% remotely and did, in fact, fully telework for 18 months prior to her termination but was denied this accommodation. Plaintiff Seagraves' only public exposure was going to the office to pick up mail, which was not an essential function of her job and could have easily been accommodated through after-hour pick-up or sent via weekly messenger. Defendants never identified a task Ms. Seagraves could not perform remotely; mail pickup was a pretext for termination. In fact, Ms. Seagraves replacement in her job is 100% remote. Additionally, Defendants attempted to change Ms. Seagraves' job description by requiring her to sign a "new job description" just weeks before her termination date. Ms. Seagraves resisted, as she had been directed to work remotely and requested that remote status be honored but Defendants refused. Ms. Seagraves requested a *Loudermill* hearing but was denied. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Seagraves. In fact, Ms. Seagraves' supervisor, Tanya Martin, told Plaintiff that DCYF made the decision very early to grant all religious exemptions, but the decision had been made that no one would be allowed to keep their jobs.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

12.    Plaintiff Belinda Brons was a Richland DCYF Placement Coordinator who was granted a religious exemption but denied an accommodation and was terminated on November 17, 2021. Ms. Brons worked three days a week remotely *before the pandemic* and worked 100% remotely for 18 months prior to termination. Her job could always have been performed 100% remote, but Defendants did not consider telework because they performed no accommodation process to determine what opportunities existed.  Ms. Brons' job entailed finding home for foster children entering care or already in care that needed to be moved. She was not required to conduct home visits, as all contact was done via email, phone or ZOOM meetings. Defendants fabricated public exposure by claiming Ms. Brons *may* need to attend foster appreciation gatherings, a pretext for termination, or that they *preferred* she have some face-to-face contact with social workers, which could easily have continued via ZOOM until the emergency ended. Ms. Brons requested reassignment through transfer to another position but was told there were no jobs available. Ms. Brons had documented natural immunity through a positive COVID-19 test presented to Defendants. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Brons.

13.    Plaintiff Benjamin Lupo was a Juvenile Rehabilitation Residential Counselor who was granted a religious exemption but denied accommodation and terminated January 16, 2022. Mr. Lupo has applied for several positions after his termination, and while others who left and are not part of a lawsuit against DCYF have returned, Mr. Lupo has been twice rejected for jobs for which he was fully qualified. At least one of those positions

remains open. Additionally, those individuals not part of any lawsuit have been brought back as on-call staff and then moved into permanent positions, while Mr. Lupo remains unemployed and rejected by Defendants. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Mr. Lupo.

14. Plaintiff Charlene Ramirez was a Registered Nurse 2 who was granted a religious exemption but denied an accommodation and terminated on November 18, 2021. Ms. Ramirez was able to perform her job for 18 months utilizing N95 mask, gloves, gown and face shield, with no COVID-19 infection, and no transmissions traced to her. Ms. Ramirez requested this continued use of PPE along with testing, but her request was not even considered. Ms. Ramirez applied for reassignment but was denied. She requested a *Loudermill* hearing and received no response. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Ramirez.

15. Plaintiff James Wilson was a Security Officer at a juvenile prison who was granted a religious exemption but denied an accommodation and was terminated on or about October 18, 2021. Mr. Wilson worked a "graveyard" shift when offenders were in their rooms, resulting in little public exposure. He worked 18 months utilizing personal protective equipment (PPE) and never caught COVID-19 and never transmitted the virus to others. He could easily have been accommodated utilizing the same methods that kept everyone safe for 18 months but was denied. Mr. Wilson applied for reassignment and was offered three jobs more than 200 miles from his home. Defendants conducted no

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

interactive dialogue and identified no undue hardship they would have suffered had they accommodated Mr. Wilson.

16. Plaintiff Kristin Rowland was a Social Service Specialist III who was granted a religious exemption but denied an accommodation and terminated on November 1, 2021. Ms. Rowland also identified in her religious exemption a serious medical diagnosis that would likewise have prohibited vaccination. The essential functions of Ms. Rowland's job were all able to be performed fully remotely. The only component requiring contact was monthly health and safety visits that could have been reassigned to the field health and safety social worker until the emergency passed. This was the field health and safety social worker's exclusive job to perform these one-time per month visits, an easy accommodation for Ms. Rowland with no burden to Defendants. Additionally, these in-person visits were completed outdoors, and any home visits occurred via video. Ms. Rowland utilized PCR testing, masks, face shields, and antibacterial disinfectants for 18 months and never caught COVID-19 or transmitted it to others. She could have easily been accommodated through continued use of PPE. Ms. Rowland applied for four accommodation positions and was denied all of them on November 1, 2021. Ms. Rowland also applied for two positions in July 2023 after the mandate was lifted, including her previous position, but was denied that position with DCYF choosing someone within the Agency who was not a religious objector. However, as of the filing of this Complaint, that position still has not been filled, demonstrating continued retaliation and discrimination against Ms. Rowland. Defendants denied her the other position claiming, "they decided to go in a different direction." Based on information and

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

belief, the office has yet to hire back one former social worker who was unvaccinated. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Rowland.

17.  Plaintiff Laura Cook was an Adoption Specialist III who was granted a religious exemption but denied an accommodation and terminated on October 18, 2021. Defendants took six weeks to reassign Ms. Cook, during which time Plaintiff was required to use sick time, paid time off and floating holidays to survive economically, after which Defendants gave Ms. Cook one day to decide on a Public Benefits reassignment position at an extraordinary pay loss. Ms. Cook took this position for five months, which was economically devastating, but was then hired by the Area Agency on Aging, fully accommodated unvaccinated, working with an elderly/medically vulnerable population. At the time of her termination, and indeed even to this day, Ms. Cook's office was still working primarily through telework, and only go into the office for staff or unit meetings, which Ms. Cook could clearly had accomplished remotely. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Cook.

18.  Plaintiff Mary Ahern was a Secretary Senior who received both a religious and medical exemption but was denied an accommodation and was terminated October 18, 2021. She did not receive an official letter formalizing termination until on or about November 29, 2021. Ms. Ahern performed her job through 100% telework for 18 months and could have been accommodated through remote work, as all essential functions of her job could be performed from her home. Defendants created public exposure by claiming Ms. Ahern

needed to check the mail and items from the court that weren't emailed to Defendants, but like most court documents, this was predominantly and almost exclusively digitized. Ms. Ahern rarely received any items from partners and contacts through the mail, and this task could have easily been performed by another regardless. At the time of her termination, her office continued to telework. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Ahern.

19. Plaintiff Michelle Whitlow was a Social Services Specialist III that received a religious exemption but was denied an accommodation and was terminated on October 21, 2021. Defendants first stated they would send Plaintiff "a list of reassignment options to choose from," but then never provided that list before telling her on October 1, 2021, that no reassignment options were available. Defendants offered Ms. Whitlow remote work on or about June 2021, but after the Mandate was implemented in August 2021, Defendants utilized an outdated job description to create public exposure and deny Ms. Whitlow an accommodation. Plaintiff's job as a mostly full-time teleworker was specifically tailored to allow her to work from home to help relieve a backlog of foster care rate assessments, despite a job description that claimed she was only a part-time after-hours employee. Ms. Whitlow worked predominantly from home and asked repeatedly for her job description to be updated but received no assistance. She could have easily been accommodated in that capacity. Ms. Whitlow twice requested a *Loudermill* hearing and was ignored first and then denied. Ms. Whitlow requested reassignment, but Defendants told her she was not eligible for any reassignment due to her job classification/description, despite the fact

she had been working 30-40 hours a week performing telework in a different capacity and had been in this job months before the Mandate. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Whitlow.

20. Plaintiff Melinda Alexander was a Child Health & Education Tracing (CHET) Social Service Specialist 3 who was granted a religious exemption but denied an accommodation and terminated on November 17, 2021. Ms. Alexander worked remotely during the lockdown; in fact, she spent less than an hour in the office per week to utilize copy services, but often did this work before or after work hours because the equipment was not being used and she could perform her work more quickly. She also worked in a small unit in the Vancouver office with only two other individuals, was able to social distance at all times, and could easily have been accommodated. In fact, those working in similar positions as Ms. Alexander were still working remotely at the time Plaintiff was terminated; these secular employees could visit the office voluntarily, and even client visits with foster parents and children were performed by Webex and not in-person. Ms. Alexander requested a reassignment but was told no position was available for her. Ms. Alexander also suggested leave without pay until the emergency passed but was likewise denied. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Alexander.

21. Plaintiff Paulene Doughtery was a JRCC Diagnostic Coordinator/Fleet Manager who was terminated on October 18, 2021, despite Defendants finding Ms. Doughtery had a sincerely held religious belief that prevented vaccination. Ms. Doughtery was also

11

1
2
3
4
5
6
7
8
9
10
11
12

granted a medical exemption to the vaccine but was likewise denied accommodation. Ms. Dougherty performed 100% of her job through telework during the COVID pandemic and could have been accommodated through continued telework until the emergency passed. Additionally, Ms. Doughtery's Fleet Manager vehicle maintenance duties were performed primarily outdoors. Defendants relied entirely on a PDF job description that stated the job may require visiting a client, even though Ms. Doughtery had never visited a client in 18 years on the job. This creation of public exposure was a pretext for termination. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Doughtery. Ms. Doughtery was told no reassignment was available.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

22.    Plaintiff Sandra Ruch was an Adoption Specialist 2 who was granted a religious exemption but denied an accommodation and terminated on October 18, 2021. Ms. Ruch was able to perform all the essential functions of her job 100% remotely and could have been accommodated until the emergency expired. In fact, at the time of Ms. Ruch's termination, staff were continuing to work from home. Defendants identified no essential function she could not perform remotely. Indeed, at the time of her termination, she was providing training via ZOOM and could have continued in this remote capacity. Ms. Ruch never had COVID-19 and never had any transmissions traced to her. She requested a *Loudermill* hearing but was told it did not apply to her. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Ruch. Plaintiff applied for a reassignment but was told no reassignment was available.

COMPLAINT                                    12                **ARNOLD & JACOBOWITZ PLLC**
                                                               8201 164th Avenue NE, Suite 200
                                                               Redmond, WA 98052
                                                               (206) 799-4221

23.    Plaintiff Spencer Mooers was the Associate Superintendent, Naselle Youth Camp, Juvenile Rehabilitation, who was granted a religious exemption but denied an accommodation and terminated on December 20, 2021. Mr. Mooers had already been given a laptop and phone for remote work and could perform a majority of his work through telework but was denied this accommodation without reasoning. Mr. Mooers applied for reassignment but upon his filing of an appeal with the Personnel Resource Board (PRB), Solomon Gilbert, Human Resources Operation Administrator, impeded his staff from vigorously pursuing reassignment placement and directed Mr. Mooers separation from DCYF. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Mr. Mooers.

24.    Plaintiff Taylor Schrodt was a Social Service Specialist II who was terminated on March 2, 2022, despite Defendants finding Ms. Schrodt had a sincerely held religious belief that prevented the taking of the vaccination. Defendants attempted to terminate Ms. Schrodt on two occasions, despite the fact Plaintiff was on pre-approved maternity leave at the time, but then rescinded the two termination notices and terminated her upon completion of her leave. This caused Ms. Schrodt tremendous stress in advocating for her legal rights despite Defendants' continued harassment. Ms. Schrodt was offered a reassignment to a call position but was highly discouraged by the supervisor to that job as being "nothing like you're used to so take that into consideration before you accept it." The job was a significant demotion and given that no accommodation process took place and reassignment is only a last resort after a legitimate process is provided, Ms. Schrodt refused reassignment until she was given a legitimate interactive dialogue to keep her in

her original position. Ms. Schrodt was authorized to work entirely remote during COVID and was able to complete all of the essential functions of her job, including investigations, via WebEx and/or Facetime throughout the lockdown and could have continued to utilize these methods as an accommodation. All her co-workers in the same job as Plaintiff likewise worked remotely. Defendants had no issue with Ms. Schrodt occasionally coming into the office at her own choice, despite her unvaccinated status. Defendants approved outdoor visits for investigations during the lockdown, but then denied this as an accommodation without reason. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Schrodt.

25. Plaintiff Theresa Beyersdorfer Bogue was a Forms and Records Analyst II who was granted a religious exemption but denied a renewal of her accommodation in this same position after six months and she was terminated on March 18, 2022. Ms. Bogue's position was granted full-time remote *before* the COVID-19 mandate, it was full-time when her job ended, and there was no reason Ms. Bogue could not have continued to receive an accommodation, despite the fact an accommodation was not even required for a full-time remote position. This full-time status was the result of a survey that Plaintiff's supervisor approved for full time in September 2021, an arrangement that was read aloud at a unit meeting in September. When employees were brought back into the office prior to the mandate effective date the following month, Plaintiff was allowed to continue full-time remote. Defendants then denied this arrangement and fabricated an excuse to terminate Ms. Bogue by changing her job classification and claiming it could not be

14

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

performed full-time remotely because she needed to upload medical records, a job Ms. Bogue's supervisor, Virginia Ford-Faulkner, claimed she had to perform for Ms. Bogue, but Ms. Ford-Faulkner was performing this task for everyone else in the unit, too. During this six-month period, Defendants severely limited Ms. Bogue's computer capabilities and actually ran programs on her computer periodically to monitor what she was doing, which had never been done before. Ms. Bogue contacted her IT department, including her supervisor and her supervisor's supervisor, Ericka Russell, which resulted in Plaintiff being reprimanded by Ms. Russell for using an exclamation mark in her email. Defendants continuously harassed Ms. Bogue with frequent questions regarding her work practices – practices that all employees were using to circumvent software glitches – and provided her antiquated equipment that greatly inhibited her ability to do her job. Ms. Bogue requested a *Loudermill* hearing but was denied. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Ms. Bogue.

26. Plaintiff Tony Lacey was a Juvenile Rehabilitation Security Officer (JRSO)-1 who worked the graveyard shift at DCYF/JRA Green Hill School in an isolated guard booth, he had no contact with residents, as any confrontation at the guard booth necessitated a call to security, Hillwide Security, who then interacted with the public. DCYF did not require visitors to Green Hill School to show proof of vaccination. Defendants determined Mr. Lacey had a sincerely held religious belief that prevented vaccination but denied accommodation and terminated him on October 18, 2021. Mr. Lacey also had a medical exemption signed by his health care provider that indicated Mr. Lacey could not

take the COVID-19 vaccine, but Defendants denied him a medical exemption without ever being his treating physician. Mr. Lacey had documented natural immunity through a positive antibody test presented to Defendants but ignored. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Plaintiff Lacey.

27. Plaintiff Tracie Dumas was a Fiscal Specialist I who was granted a religious exemption but was denied an accommodation and was terminated on October 18, 2021. On September 21, 2021, Defendants granted Ms. Dumas an accommodation for telework for 60 days, but then rescinded that accommodation a week later on September 28, 2021, without justification, simply stating that "[u]pon further review of the essential functions of your position, you are not eligible for full time telework," without identifying those essential functions or conducting a hardship analysis. Defendants also changed the coding of her position to facilitate termination. At the time of her termination, Ms. Dumas performed her work entirely remotely and could have continued with telework as an accommodation, as the essential functions of her job were entirely administrative, including maintaining a database of travel expenses, retain receipts, reconcile purchasing cards, etc. The Region 2 fiscal specialist unit to which Plaintiff was assigned continued to telework after Ms. Dumas' termination. Ms. Dumas also applied for a reassignment but received no answer. Plaintiff Dumas also had documented natural immunity to the COVID-19 virus prior to termination. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Plaintiff Dumas.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

28.    Plaintiff Yvette Hessler was a Social and Health Program Consultant 3 – Family Team Decision Making Facilitator (SHPC3 – FTDM facilitator) who worked full time remote for 20 months and was able to perform all essential functions of her job remotely. Ms. Hessler had a cardiac reaction to the first dose of COVID-19 vaccine and was granted a medical exemption as a result but was denied an accommodation to continue telework. When Ms. Hessler was terminated, her replacement as well as other colleagues in the office were still teleworking up to three days per week. Based on information and belief, other facilitators outside of Region 6 were allowed to telework full time remotely. Specifically, Ms. Hessler suffered an enlarged heart ventricle with heart palpitations that are still present. She filed an L&I claim, and despite being forced to take the vaccine, L&I only covered the medical expenses and did not pay Ms. Hessler for time lost nor use of annual/sick leave. Ms. Hessler was also forced to take FMLA, which expired in January 2022. Defendants denied Ms. Hessler an accommodation and she took Leave Without Pay (LWOP), with minor shared leave to maintain her insurance, from October 18, 2021, until her termination on May 2, 2022. Ms. Hessler applied for a reassignment in October 2021, and heard nothing; her FMLA expired January 19, 2022, and she still heard nothing for nearly three months, and when she inquired again about reassignment, they immediately responded on or about April 11, 2022, and offered a part time nights and weekend Intake SSS3 position at an $18000/year demotion, and then offered an SSS3 position in Seattle with a four-hour round-trip commute with at least a $10,000/year demotion, not including gas and commuting costs. She rejected both. One position gave her less than 24 hours to accept or reject. Defendants had previously told Ms. Hessler

that SSS3 positions could not work full time remotely. And Defendants did nothing in nearly six months to try to find Ms. Hessler a reassignment but came up with two completely unacceptable demotions in a matter of hours after she continued to ask.  Ms. Hessler asked Defendants to provide a copy of her most recent position description on or about October 15, 2021, to which she was provided a job description dated August 1, 2011, and stamped and received on August 3, 2011. This was the job description relied on by Defendants. Ms. Hessler had demonstrated natural immunity through her doctor because of her partial vaccination, and she presented this to Defendants prior to termination; Defendants continued to claim she was unvaccinated without consideration of her status and ignored Ms. Hessler's written pleas to discuss her partial vaccination circumstance. Ms. Hessler submitted a written request for a *Loudermill* hearing but received no answer. She was given no hearing. Defendants conducted no interactive dialogue and identified no undue hardship they would have suffered had they accommodated Plaintiff Hessler.

### III.    JURISDICTION AND VENUE

29.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

30.    Venue is proper in this Court under 28 U.S.C. § 1391 where DCYF is headquartered within this District and Defendants reside therein.

31.    In compliance with Wash. Rev. Code § 4.92.100, all Plaintiffs have submitted tort claims with the Washington State Office of Risk Management; sixty calendar days have passed since that submission, during which all statutes of limitations were tolled pursuant to Wash. Rev. Code § 4.92.110, § 4.96.020(4).

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1

## IV.    FACTS

2

**A.    COVID-19 Vaccines:**

3

4

32.    During 2020, several experimental vaccines were developed to purportedly limit the effects of COVID-19.

5

6

7

8

33.    These vaccines are based on a limited set of clinical trials executed over a matter of mere months before being administered to the public. These trials were characterized by fraud and falsified data at worst, negligent or intentional error at best.[1]

9

10

34.    There has never been a successful vaccine in history that prevented the transmission of the coronavirus, which was the stated purpose of the mandate.

11

12

13

14

35.    By early to mid- 2021, it had become clear that the COVID-19 vaccines developed by Pfizer, Moderna and Johnson & Johnson did not prevent recipients from being infected with, or spreading, COVID-19.

15

16

36.    Defendants had actual knowledge of these failures. *See* discussion, *infra,* regarding the extent of breakthrough cases of reinfection in fully vaccinated individuals.

17

18

37.    Thus, unlike polio or smallpox vaccines, the COVID-19 vaccines did not eliminate infection and could not end transmission of the virus.

19

20

38.    Many studies confirmed this fact, including studies from the Centers for Disease Control and Prevention (CDC), upon which Defendants allegedly relied.

21

22

23

24

25

26

---

[1] Even the mortality rate of COVID-19 was highly politicized. The most reputable study was by John Ioannidis of Stanford who reports that for those less than 70 years old the median infection fatality rate was 0.05%. This was published in the Bulletin of the World Health Organization in 2021. Exhibit A.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

39.   The single benefit of the COVID-19 vaccine, as even the government admits, is to protect an infected, vaccinated person from severe illness or death, but even that benefit is disputed, and wanes over time to the extent it exists at all.

40.   With this failure of the vaccine to stop transmission or infection comes the transition from a vaccine mandate under authority of *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S. Ct. 358 (1905), to a mandate demanding medical treatment, which is not constitutionally permissible. *See Cruzan by Cruzan v. Director, Missouri Dep't. of Health,* 497 U.S. 261, 110 S. Ct. 2841 (1990). "[T]he common-law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment." *Id.* at 2851.

41.   Moreover, under 21 U.S.C. § 360bbb-3, the Secretary of Health and Human Services "may authorize the introduction ... of a drug, device, or biological product intended for use in an actual or potential emergency" before such products receive full FDA approval. Such Emergency Use Authorizations (EUAs) are subject to strict requirements, including that "individuals to whom the product is administered are informed ... of the **option to accept or refuse administration of the product**." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) (emphasis added).

42.   The FDA has interpreted this provision of the EUA statute to mean that "[r]ecipients **must have an opportunity to accept or refuse the EUA product** and must be informed of any consequences of refusing administration of the product" and that this right to refuse can only be waived if the President makes a specific determination in writing, and only with respect to members of the armed forces.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

43. The President made no waiver of this right.

44. When Congress adopted the statute, it interpreted it in the same way, explaining it as "the *right…* to refuse administration of a product."[2]

**B.    The Proclamation:**

45. On August 9, 2021, Governor Inslee issued Proclamation 21-14 (with amendments 21-14.1 on August 20, 2021, and 21-14.2 on September 27, 2021, the "Proclamation").

46. The Proclamation provided that "State agencies…***must*** provide any disability-related reasonable accommodations and sincerely held religious belief accommodations to the requirements of this Order that are required under the American with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (Rehabilitation Act), Title VII of the Civil Rights act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), and any other applicable law." Exhibit B (emphasis added).

47. There were no additional restrictions on even health care providers, and, in fact, the Proclamation specifically exempted home health care providers from any vaccine mandate. Exhibit B, at 6.

48. Nowhere in the Proclamation is there a *per se* rule demanding vaccination or be terminated.

---

[2] H.R. Conf. Rep. No. 108-354, at 782 (2003) (emphasis added). This concern was published in August 2020 on the Centers for Disease Control (CDC) transcript of a meeting of the Advisory Committee on Immunizations and Respiratory Diseases, at which Dr. Amanda Cohn stated (@ 1:14:40), "I just want to add that, just wanted to remind everybody, that **under an Emergency Use Authorization, an EUA, vaccines are not allowed to be mandatory.** So, early in the vaccination phase, individuals will have to be consented and they won't be able to be mandated." (emphasis added). The only COVID-19 drugs made available to Plaintiffs are classified by the FDA as investigational new drugs. No FDA-licensed COVID-19 vaccines have been introduced into commerce for general marketing since the declaration of the pandemic in March 2020 through the filing of this Complaint. *See* 86 Fed. Reg. 5200, Jan. 19, 2021 (Pfizer); 86 Fed. Reg. 5211, Jan. 19, 2021 (Moderna); and 86 Fed. Red. 28608, May 27, 2021 (J&J).

49. In fact, on August 9, 2021, Governor Inslee instructed all state employees that, "Our agencies will also work diligently to support individuals with medical or religious beliefs to **require accommodation** from this directive. I am confident the time we have between now and October 18 is adequate to effectively implement this requirement and do what is needed to protect the safety of Washingtonians." Exhibit C (emphasis added).

50. Guidance from the Centers for Disease Control (CDC) removed the recommendation for a vaccine mandate for newly hired employees on January 24, 2022. Exhibit D.

51. Moreover, the CDC accommodated all religious objectors and did not terminate one. *Id.*

52. Defendant Hunter misrepresented the Proclamation in furtherance of his religious animosity against those with a sincerely held religious belief by stating that "for many positions, accommodations will not be feasible. The governor's proclamations were meant to leave few exceptions on this point." Exhibit E.

53. Neither the Proclamation nor the Governor's expressions regarding the Proclamation stated that accommodations would not be feasible. In fact, both expressed language contrary to this fabrication.

54. Defendant Hunter, because of his religious animus, created a discriminatory standard for religious objectors that he did not apply to secular employees, to wit, requiring religious objectors to "eliminate the risk" of infection, whereas vaccinated secular employees were clearly not eliminating the risk, nor were they required to take a booster that would have further strengthened virus transmission. *See, e.g.,* Exhibit F. Had "risk elimination" been the true reason demanding vaccination of the religious objectors, it would have likewise been the standard for secular employees to take the booster.

55. Nothing in the Proclamation required the DCYF fabricated standard "no public exposure" or any duty to "*eliminate* the risk" of the spread of COVID-19.

56. Nothing in DOH guidance required the DCYF fabricated standard "no public exposure" or any duty to "*eliminate the risk"* of the spread of COVID-19.

57. Nothing in OFM guidance required the DCYF fabricated standard "no public exposure" or any duty to "*eliminate* the risk" of the spread of COVID-19.

58. Nothing in CDC guidance required the DCYF fabricated standard "no public exposure" or any duty to "*eliminate* the risk" of the spread of COVID-19.

59. The Defendants' standard of requiring "no public exposure" while simultaneously demanding Plaintiffs must "eliminate" all risk of virus transmission, *infra,* evidences the discriminatory nature of Defendants' actions exercising their own discriminatory beliefs. Defendants did not require booster shots to "eliminate" risk. [3] These same secular employees were allowed to have continued public exposure despite rampant reinfection and transmission of the virus, *infra.*

60. Defendants treated medical/secular employees more favorably than those with sincerely held religious beliefs, *infra,* rendering the process of applying the presumed valid Proclamation not generally applicable.

---

[3] Defendants also provided financial incentives to vaccinated secular employees to take the booster but did not offer financial incentives to Plaintiffs to take the vaccine. And despite knowledge of the failure of the vaccine to stop infection or transmission, Defendants still mandated the failed vaccine claiming it would stop the spread of the virus but did not mandate the booster for those remaining secular employees, despite the fact that the booster would likewise contribute to virus containment. Secular employees were offered financial incentive to contain the virus, while religious objectors were terminated with no incentive. Defendants' arbitrary and capricious actions were motivated by discrimination, not health and safety.

23                **ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

61.    And secular employees were not required to take a booster to help "eliminate risk," but were allowed to continue to have "public exposure" utilizing various accommodations including masks, testing and social distancing, as well as continued telework. These same accommodations were denied to Plaintiffs.

62.    Many secular employees were allowed to continue to telework long after Plaintiffs in the same job were terminated and denied telework, *infra.* For example, Plaintiff Kristin Rowland worked in the Port Angeles Office, where all units were allowed to telework full-time up until the mandate was lifted in May 2023, and were then required to be in the office two days a week until the present. Denying telework was a pretext for terminating those with a sincerely held religious belief. Clearly Ms. Rowland, as all Plaintiffs, could have been accommodated through telework.

63.    In essence, Defendants created their own mandate within the mandate by establishing their own criteria in awarding accommodations – no public exposure and elimination of all risk – that was not equally applied to all employees. They then accommodated these secular employees with measures not afforded to those with sincerely held religious beliefs. This process did not comply with the Proclamation or federal and state law but was a perfect pretext for terminating religious objectors.

64.    Defendants did not have the authority to insert these changes into the Proclamation.[4]

---

[4] Plaintiffs likewise dispute Defendants' authority to add a new condition of employment to the contract of each Plaintiff, notably the taking of a vaccine, with no ability to be accommodated despite being granted an exemption. *See Feds for Medical Freedom v. Biden,* 63 F.4th 366, 378 (5th Cir. 2023) (holding that "[d]uties, responsibilities, or working conditions' plainly refers to duties, responsibilities or working conditions of the employee's workplace....It doesn't apply to personal medical choices. That result follows *a fortiori* from *Gustafson* because if 'working conditions' does not include peephole cameras in *workplace changing rooms*, it certainly does not include private, irreversible medical decisions made in consultation with private medical professionals outside the federal workplace.").

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

65.    Defendants, in applying the Proclamation to each Plaintiff, changed the terms of the Proclamation and effectively rewrote federal and state law cited in the Proclamation. "Rules and regulations promulgated by a state agency …*may not amend or change the enactments of the legislature." Allen v. Employment Sec. Dept.,* 83 Wash.2d 145, 516 P.2d 1032 (1973) (en banc) (emphasis added).

66.    Under the Washington Law Against Discrimination, Wash. Rev. Code. 49.60 (WLAD), cited in the Proclamation, any employer's restrictions of employees' constitutional rights must be narrowly tailored to further a compelling government interest. *See, e.g., Olympus Spa v. Armstrong,* __ F. Supp. 3d __, 2023 WL 3818536 at fn.9 (W.D. Wash. June 5, 2023) (citing *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 113 S. Ct. 2217 (1993)); *see also Rolovich v. Washington State University,* 2023 WL 3733894 (W.D. Wash. May 30, 2023) (upholding a claim by Plaintiff against WSU for failure to accommodate under WLAD).

67.    Defendants did not hold any interactive dialogue to find a reasonable accommodation and therefore, by logic, could not have made a determination that their response was narrowly tailored.

68.    This act defied the Proclamation and the law Defendants were required to follow.

69.    Defendants did not narrowly tailor the restriction to further its interest in containing the spread of the virus, but instead, utilized the most restrictive means available to allegedly achieve their objective.

COMPLAINT                                    25                    **ARNOLD & JACOBOWITZ PLLC**
                                                                  8201 164th Avenue NE, Suite 200
                                                                  Redmond, WA 98052
                                                                  (206) 799-4221

70. Defendants did not consider other alternatives to full vaccination, such as PPE, especially given the failure of the vaccine to stop the spread or reinfection of those who were vaccinated, and Defendants' actual knowledge of that fact.

71. Defendants allowed secular employees who reinfected with COVID-19 to continue to spread risk while performing public facing duties, not requiring a COVID-19 booster despite its availability, while allowing these secular employees to utilize PPE not allowed for religious objectors.

72. Also, given that not one Plaintiff had a COVID-19 transmission or infection traced to him/her in 18 months, failure to consider PPE as a reasonable accommodation demonstrates the discriminatory intent of Defendants' policy. The utilization of PPE could not have been more successful.

73. Five separate arbitrators, three from WDFW, one from DOR, and one from DOC, have all analyzed similar actions taken by Defendants in this action, and found, *inter alia,* that failure to consider other accommodations outside vaccination was concerning and raised questions of good faith, *infra.* The Proclamation required Defendants to consider accommodations, which they did not, and which multiple arbitrators have recognized.

74. Defendants were advised in a September 20, 2021, email from Kelly M. Woodward, State Human Resources Interim Deputy Assistant Director, Office of Financial Management (OFM), that "[a]gencies are advised to consider combinations of accommodations in determining if an accommodation can be granted, and to do so in consultation with legal counsel…." Exhibit G; *see also* Exhibit H, at 17-18, and Exhibit I, at 17.

75. OFM did not dictate DCYF's actions in this case but left the accommodation process to each agency. "[I]t has been determined that we never relinquished responsibility of the management of Religious Accommodations from the COVID mandate back to agencies, because agencies had already managed those from the beginning." Exhibit J.

76. Indeed, OFM's website demonstrates that OFM sources the Society for Human Resources Management (SHRM), an HR think tank, as an expert source of employment related guidance, including references to lawful hiring, terminations, and accommodations.[5] Exhibit K at 3, 4, 5, 7, 9, 10. Defendants had a full toolbox of resources available which would have enabled swift, effective accommodation processes that complied with the law. Defendants chose to ignore many choices and approaches offered in this legal guidance.

77. The guidance provided by SHRM stated that "[t]he supervisor and employee *will meet* to discuss the request and decision on an accommodation. If the employee accepts the *proposed religious accommodation*, the immediate supervisor will implement the decision. If the employee rejects the proposed accommodation, he or she *may appeal* following the company's general grievance policy and procedure." Exhibit L at 2 (emphasis added). Defendants never met with any Plaintiff prior to the decision to terminate, and never offered any accommodation. No appeal was permitted.

---

[5] SHRM-Olympia identifies numerous state employees who are on the Board of Directors for that organization, including, but not limited to Tressa Smith, Amanda Torres, Dr. Yolanda Geolingo, Sarah Sablan, and Rafael J. Fernandez. Exhibit M. Membership in this elite organization by state employees, which identifies itself as "the starting point for continuing education, networking, information, professional development, and continued support of excellence in Human Resources," Exhibit N, is also assumed, specifically HR employees.

78.  SHRM also recommended a form to be used in the accommodation process, which requires employee's supervisor to "Describe the requested accommodation," and more importantly, "Evaluation of impact (if any)" on the business needs of the employer. Exhibit O. The only form Plaintiffs completed was a form seeking a religious exemption; they were never asked what accommodation they sought, Defendants never offered any accommodations, and Defendants certainly never identified any impact/hardship they would have suffered based on any accommodation.

79.  Additionally, OFM, applying the requirements of the Proclamation, accommodated 100% of their employees who were found to have a sincerely held religious belief, as well as 100% of their workers who were found to have a medical condition that prevented the taking of the vaccination. Exhibit P.

80.  Many other agencies also fully accommodated their employees without a blanket denial to all unvaccinated religious objectors, to include Department of Commerce (COM), Housing Finance Commission (HFC), Office of Administrative Hearings (OAH), Student Achievement Council (SAC), State Investment Board (SIB), Utilities and Transportation Commission (UTC), and all other agencies categorized as small agencies. *Id.* at 6-8. Employment Security Department (ESD) accommodated 257 of 258 employees found to have a sincerely held religious belief, while Health Care Authority (HCA) accommodated 79 of 86 employees with a religious exemption. *Id.* at 7.

81.  These agencies complied with the language of the Proclamation demanding compliance with WLAD and Title VII.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

82. Furthermore, "[w]e did not direct anything related to an agency's reasonable accommodation policy; however, we did provide the HR community with the attached guidance. Ultimately, we encouraged agencies to work with their Assistant Attorneys Generals regarding reasonable accommodations." Exhibit Q.

83. It is unknown the extent, if any, to which Defendants, including Defendant Hunter, consulted legal counsel.

C.    **The Plaintiffs:**

84. Plaintiffs were employees of DCYF until they were wrongfully terminated on or about October 18, 2021.[6]

85. Collective bargaining agreements for each Plaintiff did not list vaccination as a condition of employment.

86. Plaintiffs had never been required to take a vaccination in the history of their employment.

87. Defendants each made the decision to terminate Plaintiffs without accommodation and refused to engage Plaintiffs in a legally required interactive dialogue to discuss accommodations that would have kept Plaintiffs employed.

---

[6] Termination dates for a few Plaintiffs vary based on Defendants granting minimal temporary reassignments, and these reassignments were terminated shortly after Plaintiffs began the new job, with no reason other than a claim in "change of business practice," despite the permanent nature of each Plaintiff's job. In one instance, Plaintiff Bogue's job was fully remote prior to COVID, but after granting her a religious exemption and accommodating her for six months in that same position, Defendants thereafter claimed she couldn't perform the work remotely and they terminated her. Reassignments are not accommodations and cannot replace the accommodation process that each Plaintiff failed to receive. All temporary reassignments involved a substantial reduction in pay and grade.

COMPLAINT                    29          **ARNOLD & JACOBOWITZ PLLC**

88. Defendants each refused to identify an undue hardship that they would have suffered had DCYF accommodated Plaintiffs, but instead created hypothetical risks that are not permissible under the law.

89. Defendants each created and implemented a *per se* policy that DCYF fully implemented, to wit, that no accommodations would be allowed and that no discussion was permitted on the topic of accommodation, undue hardship, individualized dialogue, or narrowly tailored constitutional infringements, a condition not found in the language of the Proclamation they were allegedly enforcing, nor in any guidance provided by OFM, DOH, CDC, or otherwise. Defendants created this policy and custom that guaranteed the violation of Plaintiffs constitutional rights.

90. To the extent a process existed, each Defendant was intimately involved in denying any meaningful dialogue with Plaintiffs, making excuses with rhetoric denying accommodation, signing termination letters enforcing the wrongful termination of Plaintiffs, misapplying the requirements of the Proclamation, and creating their own policy establishing a mandate within a mandate that violated Plaintiffs' civil rights.

91. Beginning in August 2021, Plaintiffs began applying for religious and medical exemptions[7] from the Department's new employee vaccination requirement.[8] Plaintiffs

---

[7] Plaintiffs Ahern and Doughtery each applied for and were granted both a religious and medical exemption but denied permanent accommodation for both and were terminated. Plaintiff Yvette Hessler had a significant cardiac reaction to the first dose of COVID-19 vaccine and was granted a medical exemption as a result but was denied an accommodation to continue telework. When Ms. Hessler was terminated, her replacement as well as other colleagues in the office were still teleworking up to three days per week.

[8] DCYF utilized a discriminatory Religious Accommodation Request Form that created a predictable chilling effect on religious objectors who were led to believe that *the taking of any vaccine or medicine in the past* precluded the granting of any religious exemption to the COVID-19 vaccination. The form used by DCYF contained only two "yes/no" questions, without any room or opportunity for discussion, one of which required the objector to agree/affirm that he/she had never received "*a vaccine or medicine from a health care provider as an adult." See,*

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

provided Defendants documentation of their sincerely held religious belief and/or medical waiver from the vaccine, then waited for Defendants to decide on the sincerity of their beliefs and/or medical condition and begin the accommodation process.

92. Defendants never engaged in the accommodation process but globally denied all accommodations during the first step of the exemption process.

93. Defendants never talked with any of the Plaintiffs prior to issuing letters that Plaintiffs were being denied an accommodation and would be terminated.

94. In fact, Defendants sent a form email discouraging any interaction with DCYF HR Leadership regarding accommodation. "PLEASE DON'T ASK FOR AN UPDATE ON YOUR REQUEST. We are unable to provide that information at this time due to the volume of requests received." Exhibit U (emphasis in original).

95. The same notice also stated that "A meeting *may be scheduled with the employee*, management, HR and WCAU to discuss the RA request and determine what accommodations can be made," *id.* (emphasis added), but no meetings ever took place and no discussion regarding accommodations ever occurred. The language itself indicates a permissive meeting, despite the fact that the accommodation process is mandatory.

96. The notice also stated that "Leave is a form of accommodation," but Plaintiffs were denied leave without pay until the temporary emergency passed.

---

*e.g.,* Exhibits R, S, T. This question had no relevance to whether an individual had a sincerely held religious belief to the COVID-19 vaccine.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

97. Plaintiffs each received an all-in-one response that they had been granted a religious and/or medical exemption but were denied accommodation and would be terminated.

98. Thus, Defendants conceded that each Plaintiff had a sincerely held religious belief that conflicted with the taking of the vaccine, and/or a medical exemption.

99. But Defendants refused to engage in an accommodation process to resolve the conflict, *see Suarez v. State,* Wash. App. 2d 609, 630 (Wash. App. Ct., Div. 3, Sep. 20, 2022), *rev. granted in part, denied in part,* 200 Wash.2d 1026, 523 P.3d 1186 (2022), because they unilaterally created a policy where all accommodations were denied without discussion, interaction, dialogue or hearing with anyone. The decision was made before the process started.

100. Defendant "does not point to any attempts it made to eliminate this conflict…This passive, generalized action was not an attempt to accommodate [Plaintiff's] scheduling conflict.  It was neither dialogue nor an attempt at cooperation….[T]here is no evidence that the School offered or suggested any accommodations." *Suarez,* 200 Wash.2d at 630.

101. Shortly after applying for an exemption as part of the first step in a two-step process, nearly every Plaintiff received the same *pro forma* email denying accommodation and informing of termination. These were form letters, without dialogue, input, or consideration, and mass mailed to everyone who sought to assert their rights under the Proclamation. Exhibits V and W; *see also* Exhibit X, where Defendants granted Plaintiff Dumas a full time telework accommodation, and then rescinded it a week later without justification.

102. Defendants had no discussions with Plaintiffs between the time Plaintiffs applied for an exemption and the time DCYF issued these termination letters.

103. Defendants combined what should have been a two-step process into one step, made a unilateral decision on their own, resulting in Plaintiffs never entering an accommodation process.

104. This predetermined decision does not comply with the Proclamation, WLAD or constitutional protections.

### 1.    DCYF conducted no individualized assessment for accommodation:

105. Defendants never conducted an individualized, interactive dialogue in compliance with the law. There was no dialogue with any Plaintiff that occurred before Plaintiffs each received final decisions denying accommodation and notices of termination, *infra*.

106. "To demonstrate good faith engagement in the interactive process…employers can point to **cooperative behavior** which promotes the identification of an appropriate accommodation," and "**both parties discover the precise limitations and the types of accommodations which would be most effective**; the evaluation of proposed accommodations requires further dialogue and **an assessment of the effectiveness of each accommodation**, in terms of enabling the employee to successfully perform the job." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1115 (9th Cir. 2000) (en banc), *vacated and remanded, U.S. Airways, Inc. v. Barnett,* 535 U.S. 391 (2002). The interactive process is mandatory rather than permissive obligation on part of employers. *Id.* at 1113. "Almost all of the circuits to rule on the question have held that an employer has a mandatory obligation to engage in the interactive process and that this obligation is

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation." *Id.*

107. Indeed, Kathryn Leathers, Governor Inslee's chief legal counsel, in response to a comment by a reporter seeking explanation regarding the failure to accommodate plaintiffs who had filed a lawsuit, stated, "I don't know how we could comment on the **process between each employer and each employee**, or what a 'proper' accommodation is in any particular work setting – it will vary, **because every work setting is different."** Exhibit Y (emphasis added). Accordingly, the interactive dialogue must take place between "each employer and each employee" because "every work setting is different." This did not happen.

108. Indeed, Defendant Hunter stated that which he clearly did not do: "We will follow a formal process for evaluating every exemption request *individually.*" Exhibit E. Instead, based on personal religious animus outside of his official capacity, Defendant Hunter determined that evaluations would be made globally based on position descriptions and not on individual assessments and dialogue.

109. Indeed, Defendants relied on position statements to evaluate ability to accommodate, without ever discussing the job with the individual employee. In fact, Defendants simply "categorized" positions as, for example, as "yellow" or "blue" based on a reading of the position statement, and then sent the appropriate denial of accommodation letter based on that color categorization that Defendants unilaterally assigned. Exhibit Z at 11.

110. Plaintiff Stephanie Seagraves, being denied any ability to discuss an accommodation with Defendants, knew this was a circumvention of the law. In response she sent an email

to the nameless email address instructing them that she was represented by legal counsel and any correspondence regarding her accommodation should be directed to her attorney, providing name and address. Defendants, knowing she was represented, continued to communicate directly with her and not her attorney, stating, "We will send correspondence to your attention and you are welcome to forward it to whomever you choose." Exhibit AA. Ms. Seagraves was *not* a member of any union, never paid any dues, and therefore, had no bargaining representative other than her attorney on whom she relied.

111. What should have been a two-step process was abbreviated into one step, during which time there was no discussion or dialogue with each Plaintiff to discuss work environment, essential job functions, ability to social distance and/or any other factor that affected the ability to accommodate. And no interaction with Plaintiff's attorney.

112. Defendants used one form, *supra,* which contained two questions regarding one's usage of vaccines or any medicines in the past. Exhibits R and S. This form served as a request for a religious exemption and a request for an accommodation but there was no discussion prior to Defendants either granting or denying the religious exemption and/or denying accommodation.

113. Defendants did not follow the two-step procedure but skipped all dialogues that were to occur after the first step.

114. Defendants never discussed with any Plaintiff "essential functions of their job" or the "business requirements" at each location to consider workplace safety.

115. Instead, Defendants focused entirely on job descriptions and concluded, without reasoning, that "An accommodation within your current position cannot include eliminating essential functions of your position. After careful review, the only reasonable accommodation we can offer is the. Possibility of reassignment." Exhibit X. Thus, Defendants denied accommodation on the basis that an essential function of the Plaintiff's job would have to be eliminated, but Defendants never identified what essential function would need to be eliminated, nor did they go through an analysis of how that essential function could be accommodated through various methods, such as job sharing, telework, or other available means.

116. In fact, form letters sent to terminated religious objectors often failed to fill in the blank for inserted "Choose an item" instructions found in the body of the email. Exhibit AB. There was no discussion with anyone terminated; Defendants simply chose options offered on form letters and created plausible reasons they unilaterally decided.

117. Relying on job descriptions in lieu of a personal dialogue created a pretext for Defendants' discriminatory practice where Defendants identified an alleged essential job function without discussion with each Plaintiff, and then theorized how that essential job function required public interaction. Once public interaction was surmised, accommodation was denied on that basis. Conveniently, public exposure was always found.

118. Plaintiffs received no invitation to engage in a process, but instead, each received notice that they would be terminated because their exemption was nominally approved but their accommodation was denied. Exhibits V and W.

COMPLAINT                                    36                    **ARNOLD & JACOBOWITZ PLLC**
                                                                 8201 164th Avenue NE, Suite 200
                                                                 Redmond, WA 98052
                                                                 (206) 799-4221

119. OFM guidance stated that employees terminated for other than disability reasons, such as those with religious exemptions, were entitled to "no specific notice requirement." Exhibit AC.

120. The granting of an accommodation was so rare that in the event it happened, the event triggered "steam coming out of my ears right now" by Amy Rogers, Regional Operations Manager involved in the granting and then rescission of an accommodation to Plaintiff Tracie Dumas. Exhibit Z at 2. Defendants then changed the coding of Ms. Dumas's job, without discussing with her, to facilitate termination.

121. The interactive process is mandatory, and the obligation is "triggered either by the employee's request for an accommodation or by the employer's recognition of the need for an accommodation." *Martinez v. Costco Wholesale Corp.,* 481 F. Supp. 3d 1076, 1099 (S.D. Cal. 2020) (quoting *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1112 (9th Cir. 2000). *See Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1113 (9th Cir. 2000) (en banc), *vacated and remanded, U.S. Airways, Inc. v. Barnett,* 535 U.S. 391(2002) (dialogue is a mandatory duty rather than permissive obligation on part of employers).

122. Even if an employer claims no available reasonable accommodation exists, if it did not engage in a good faith interactive process as required, it cannot be known whether an alternative accommodation would have been found. *Salgado v. Iqvia, Inc.,* 459 F. Supp. 3d 1318, 1333 (S.D. Cal. 2020).

123. "The interactive process determines which accommodation is required. Indeed, the interactive process could reveal solutions that neither party envisioned." *Wysinger v. Auto Club of S. Cal.,* 157 Cal. App. 4th 413, 425, 69 Cal. Rptr. 3d 1 (2007).

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

124. Defendants' covert policy of denying an accommodation process, theoretically on the basis that they had to stop the transmission of the virus, does not answer the overall question of whether they could have accommodated Plaintiffs and still achieved that objective. *See Zimmerman v. PeaceHealth,* Case No. 3:22-cv-05960, (W.D. Wash. Nov. 9, 2023) at *12.

125. An employer cannot claim "that increased risk of COVID-19 exposure was sufficient to establish undue hardship such that [n]o accommodation was possible." *Zimmerman,* at *19 (declining to follow *Beuca v. Washington State University,* No. 2:23-cv-0069 TOR, 2023 WL 3575503 (E.D. Wash. May 19, 2023)).

126. These termination letters provided notice to Plaintiffs that a final decision had been made regarding accommodation and termination. These decisions were made without any discussion with Plaintiffs regarding their job classification, essential functions, working environment, and business and workplace safety requirements, all which Defendants claimed they "carefully reviewed" but clearly did not. Exhibit X at 2.

127. Plaintiffs' questions or pleas for a dialogue were directed to a nameless, autoreply mailbox, titled "Reasonable Accommodations," signed, "Religious Accommodation Committee." Exhibit AA. This impersonal and nameless generic email address caused tremendous frustration and anxiety to Plaintiffs, who were denied any ability to dialogue with a human but were instead continuously inundated with form emails that were nonresponsive to their questions and simply reiterated they would be terminated without the vaccine.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

128. Even Plaintiffs seeking a religious exemption were often denied that exemption from this nameless email address, leaving the Plaintiff without recourse to actually speak to an individual regarding the specific reasons for the religious exemption denial, or to contest the more intrusive personal data Defendants demanded. Exhibit AD. They had to either comply or be terminated, without other options.

129. Defendants never spoke with Plaintiffs directly prior to issuing this notice of termination. Any discussion with each Plaintiff that took place after Defendants had already delivered a final denial of accommodation, a notice of termination, and then offered an obligatory sham meeting to confirm what was already decided.

130. Defendants never discussed any issues with Plaintiffs regarding their workspace, job responsibilities, essential functions, or public exposure, all of which Defendants claim they "considered" in denying accommodation. There was no consideration but a unilateral determination that there would be no accommodation.

131. DCYF established a *per se* rule against any accommodation in a blanket denial to all religious objectors. By stating that nothing short of a vaccine would be accommodated is equivalent to stating Defendants will not consider ANY accommodations. The Proclamation demanded compliance with WLAD, and WLAD demands an accommodation process.

132. Defendants refused to "address its legitimate concerns with rules short of a total ban." *South Bay United Pentecostal Church v. Newsom,* 141 S. Ct. 716, 718 (2021) (Thomas, J. and Gorsuch, J., concurring), "nor…why the less restrictive options," *id.,* were not available.

133. The Proclamation, as applied to Plaintiffs by Defendants, "is a one-size-fits-all sledgehammer that makes hardly any attempt to account for differences in workplaces (and workers) that have more than a little bearing on workers' varying degrees of susceptibility to the supposedly 'grave danger' the Mandate purports to address. *BST Holdings, LLC v. OSHA,* 17 F.4th 604 (5th Cir. 2021), *aff'd National Federation of Independent Business v. OSHA,* 142 S. Ct. 661 (2022).

134. This "one-size-fits-all" application involving no discussion with Plaintiffs regarding the nuances and differences in their job is "both overinclusive (applying to…employees in virtually all industries and workplaces…with little attempt to account for the obvious differences between risks facing, say, a security guard on a lonely shift, and a meatpacker working shoulder to shoulder in a cramped warehouse,)" *BST Holdings,* 17 F.4th at 611, as well as "underinclusive" in that it applies to some and not all. With respect to it being underinclusive, Defendants did not demand a booster or additional vaccinations for secular employees, despite reinfection. Instead, secular employees were offered financial payment for boosters, Exhibit AE, while religious objectors were offered termination or vaccination. Both evidence that Defendants' actions were arbitrary and capricious, not in furtherance of its alleged compelling interest to "eliminate" risk of transmission and infection.

135. "Indeed, underinclusiveness of this sort is often regarded as a telltale sign that the government's interest in enacting a liberty-restraining pronouncement is not in fact, 'compelling.'" *BST Holdings* 17 F.4th at 616, *cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 542-46, 113 S. Ct. 2217 (1993) (city's ban on religious

animal sacrifice but corresponding allowance of other activities similarly endangering public health belied its purportedly "compelling" interest in safe animal disposal practices.) "The underinclusive nature of the Mandate implies that the Mandate's true purpose is not to enhance workplace safety, but to instead ramp up vaccine uptake by any means necessary." *BST Holdings* 17 F.4th at 616.

136. The Proclamation, as applied by Defendants, "cannot prevent vaccinated employees from spreading the virus in the workplace…." *BST Holdings,* 17 F.4th 604 fn.19. Once Plaintiffs knew of the failure of the vaccine to prevent transmission and infection*,* the compelling interest likewise fails, if not entirely, then at least with respect to suggested accommodations as a narrowly tailored step towards reducing the spread of the virus. The means used to further the compelling interest are only deemed effective after evaluating how effective those means would be, which Defendants did not address. Defendants had to conduct this balancing, which they did not.

137. Defendants tried to avoid this balancing by alleging that COVID-19 was so grave, all acts taken to restrict its spread were justified, but this is not supported by the law. *See Zimmerman v. PeaceHealth,* Case No. 3:22-cv-05960-TMC (W.D. Wash., November 9, 2023).

138. An "Agency cannot use its … powers as a stop-gap measure," *BST Holdings* 17 F.4th at 616 (citing *Asbestos Info. Ass'n./North America v. Occupational Safety and Health Admin,* 727 F.2d 415, 422 (5th Cir. 1984)). A "stop-gap" measure occurs when Defendants "craft[] a multi-layered standard that is comprehensive and feasible for all covered work settings, including mixed settings of vaccinated and unvaccinated workers,

41

is an extraordinarily challenging and complicated undertaking, yet *the grave danger that COVID-19 poses to unvaccinated workers obliges the agency to act as quickly as possible,*" a position rejected in the vaccine mandate context. *BST Holdings,* 17 F.4th at 616 (emphasis added). "[C]ourts have consistently recognized that the 'protection afforded to workers … should outweigh the economic consequences to the regulated industry.'" *Asbestos Info.* at 423. "[B]ut for all the reasons we've previously noted, the Mandate flunks a cost-benefit analysis here." *BST Holdings,* 17 F.4th at 616. "Even if the Constitution has taken a holiday during the pandemic, it cannot become a sabbatical. *Roman Cath. Diocese of Brooklyn v. Cuomo* 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring).

139. Additionally, this *per se* rule in making a "generalized determination" that employees posed a risk of danger such that Defendants were forced to deny all accommodations, similar to a "stop-gap measure," *id.,* was similarly rejected in arbitration against DOC. This decision ordered reinstatement of a DOC employee with backpay, benefits and full seniority. Exhibit AF.

140. The arbitrator found that DOC failed to abide by the ADA and WLAD, "never conducted the required individualized assessments of whether the grievant posed a threat in the workplace or her present ability to safely perform the essential functions of her job," made only a "generalized determination" that the employee posed a risk unvaccinated to the health and safety of others, and that DOC "failed to engage in the required interactive process in considering possible reasonable accommodations," but "simply concluded that

reassignment was the only available accommodation for the grievant's unvaccinated status." *Id.* at *8 (emphasis added).[9]

141. Defendants "failed to make **an individualized assessment** of the **threat posed by [Plaintiff's] performance** of her job and Defendants failed to engage in the required interactive process in determining the possible reasonable accommodations of the [Plaintiff]" *Id.* (emphasis added).

142. "In sum, the evidence shows that the Employer [Department of Corrections] failed to engage the [employee] in a legitimate interactive process. It provided no opportunity for employee to present her own ideas for a potential reasonable accommodation." *Id.* at *5.

143. This one-size-fits-all "sledgehammer," *BST Holdings,* 17 F.4th at 612, "flunks a cost-benefit analysis." *Id.* at 616.

144. Every accommodation Plaintiffs suggested – and it should be noted that Defendants suggested none – was received with a resounding refusal and the restatement that the Proclamation prevented any work by the unvaccinated.

145. While an undue hardship may include a valid safety concern, *see Bhatia v. Chevron U.S.A., Inc.,* 734 F.2d 1382 (9th Cir. 1984), Defendants did no burden analysis regarding the potential "impact on coworkers or its cost," *id.* at 1384.

---

[9] Res judicata prevents relitigation of the same claim previously tried and decided. *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318 (9th Cir. 1992). Res judicata bars relitigation whether or not the parties were the same or the claim was in the same cause of action. *Id.* at 1320 (citing *McClain v. Apodaca,* 793 F.2d 1031, 1033 (9th Cir. 1986)). An arbitration decision can have res judicata effect in subsequent civil trials. *Clark,* 966 F.2d at 1321, specifically with proof of a "sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated." *Id.*

146. Defendants had an obligation to conduct a risk/benefit analysis to determine if the risk Plaintiffs allegedly posed unvaccinated outweighed the duty to resolve the conflict between Plaintiffs' sincerely held religious beliefs and the taking of the vaccine.

147. Defendants made no such analysis in an attempt to resolve the conflict.

148. In fact, while summarily denying accommodation to religious objectors without discussion, Defendants were enforcing and granting accommodations to a new category of employees demanding accommodation – "high risk employees" – and going to great extremes to assure all "high risk" applicants were accommodated while denying accommodation to the two categories of employees for whom WLAD demanded protection. "If an employee is at high-risk, as defined by the CDC, the employer *is required to accommodate them."* Exhibit AG at 6 (emphasis added). "If an employee is requesting accommodation due to being in a high-risk group and they provide sufficient facts to support the request, *the DCYF must provide the accommodation.* A DCYF form has been created for employees to use to report to the employer that they fall into one of the CDC categories and are requesting accommodation. *It is not recommended to seek additional documentation beyond what is included in the form*." *Id.* at 6 (emphasis added).

149. DCYF accommodated 319 high risk applicants, with many of those accommodations including "[t]elework full time through end of state of emergency." Exhibit AH. There was no "essential function" analysis to allow full time telework to this newly created protected category as was allegedly applied to religious objectors. Six employees were granted full time leave through the end of the state of emergency, while 60 employees

were granted full time telework through the end of the state of emergency. An additional 10 employees were granted some variation of telework and office and leave. These accommodations were provided to a wide range of job titles, including Area Administrator (4) (Field Operations), Chief Review Judge, Director of Field Operations, JR. Associate Superintendent Echo Glen (the identical position Plaintiff Spencer Mooers held and was not accommodated), Office Manager (5) (Field Operations) and QA Administrator. *Id.* The same accommodations – leave until the emergency ended or full time telework until the emergency ended – should have been provided to Plaintiffs, as well.

150.   While DCYF was sending multiple demands to Plaintiffs for intrusive and personal details regarding their faith, and then denying accommodation without even a discussion, the DCYF policy was simultaneously assuring full accommodation for "high risk" employees who are not protected under WLAD, and without any "additional documentation" beyond the initial application. "Can I deny [high-risk employees] telework and/or leave? No. The Proclamation explicitly states that employees '*must have access to accommodations* to prevent greater risk of contracting COVID-19, and these decisions cannot be left solely to the employer." Exhibit AG at 7 (emphasis added).

151.   Further, Employment Security Department (ESD) passed an emergency rule allowing an employee to file for benefits due to lack of work when they are unable to work due to being a member of a high-risk group, instructing DCYF to provide documentation to support the claim for benefits based on a lack of work. Defendants did not provide the same documentation for many Plaintiffs who were denied unemployment benefits.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

152. Additionally, DCYF policy was that departments "can hire temporary/non-permanent employees, as long as they do not permanently replace the high-risk employee." *Id.* at 8. So, while DCYF policy was to fully terminate religious and medical exempt employees and replace them immediately, often demanding that Plaintiff update their job description for the new hire, a new category of "high risk" employees were being fully accommodated, and their jobs held seemingly indefinitely until the emergency passed.

153. There is no reason DCYF policy could not have afforded Plaintiffs the same accommodations and consideration.

154. This shows disparate treatment of religious objectors compared to secular employees, as well as an arbitrary and capricious treatment of religious objectors based solely on the fact of their faith. Indeed, even those Plaintiffs with a medical exemption to the vaccine should have been treated equally with those employees guaranteed accommodation, as their risk of an adverse reaction from the vaccine was no less dangerous than the at risk employees.

155. The speed at which Defendants denied accommodation proves that no dialogue occurred, and no meaningful analysis of any factors could have possibly taken place.[10]

156. This highlights the problem with HR bureaucrats located hundreds of miles from a work site with no experience in or knowledge of the job who are given complete authority to make decisions without a dialogue with the employees.

---

[10] Reassignment, discussed *infra,* is not an accommodation. It is a last resort only after the accommodation process has failed. https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D (last visited January 30, 2024). Defendants made very limited attempts at reassignment. In fact, Laura Allen, Workplace Claims & Accommodations Consultant, stated that "continually pursuing multiple positions isn't part of our practice for vaccine reassignments." Exhibit AI.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

157. Plaintiffs had no idea what essential functions Defendants allegedly relied upon to determine unilaterally that no accommodation was available. They never discussed anything with any of the Plaintiffs and certainly not any essential functions or factors they allegedly considered in denying accommodation.

158. This proved tremendously frustrating for Plaintiffs, who never received answers to their concerns regarding why they were never given any accommodation process through any dialogue with Defendants.

159. This made the entire process meaningless, where there was no discussion of any accommodation and no specific finding of an undue hardship to any accommodation Plaintiffs presented. Defendants considered no accommodations and presented none themselves, which rendered the finding of a sincerely held religious belief meaningless.

160. Defendants' entire process was chaotic from the beginning, caused by the speed at which Defendants attempted to mass terminate religious objectors.

161. Other than alleging that the unvaccinated threatened safety, which the vaccine would not have prevented, Defendants did not identify any other significant risk of harm. Safety concerns *alone*, unilaterally declared by Defendants and enforced by fiat on Plaintiffs, do not automatically constitute an undue burden, and otherwise is not a burden when there is no discussion with Plaintiffs regarding their ability to alleviate that burden/risk through accommodation.

162. Even essential job functions could be accommodated without undue hardship to Defendants. Defendants had a duty to go through that analysis, but they refused.

163. An accommodation process was required to determine whether each Plaintiff could be accommodated through various methods, including, but not limited to, job-sharing, reassignment of unessential and/or essential functions, or personal protective equipment (PPE) that had provided perfect protection throughout the pandemic with not one COVID-19 transmission or infection traced to Plaintiffs.

164. An accommodation process was required to identify the undue hardship Defendants would have suffered had any number of potential accommodations been considered.

165. Job descriptions were outdated, misrepresented, misinterpreted, or contained fabricated duties Defendants unilaterally assumed but were not accurate. Many of the job descriptions allegedly relied on by Defendants to deny accommodations were documents Plaintiffs had never even seen.

166. For example, Plaintiff Yvette Hessler requested a copy of her Position Description (PD) for her job as a FTDM Facilitator. When it was provided, it was dated August 1, 2011, and stamped and received on August 3, 2011. Exhibit AJ at 3-8. Plaintiff's supervisor, Nicole Muller even acknowledged, "you stated you needed a copy of your position description. Attached is the original PDFR that is very old and outdated – and in Bremerton." *Id.* at 2. Ms. Hessler worked out of Centralia. Defendants required Ms. Hessler to review her PD for the purpose of posting Ms. Hessler's job to find a new hire to replace her. Defendants asked Ms. Hessler to sign and date her PD during her review of the updated document on October 18, 2021, the date the mandate took effect. But Defendants did not use the updated PD, *id.* at 10-15, prior to issuing a denial of accommodation and notice of termination, and never identified any essential functions

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

of her job that required public exposure, either from the outdated PD or the updated one. Nowhere in the PD did it state that vaccination was a requirement. Teleworking was encouraged in the updated PD that stated that the employee "Must also be able to be flexible and facilitate FTDM's through video conferencing. This allows 'greater participation of the meeting.'" *Id.* at 13.

167. At the time of termination, Plaintiff Michelle Whitlow was performing the job of a Foster Care Rate Assessor, which had already been predominantly a teleworking position for years. Ms. Whitlow's coworker, Liana Wilson, had been doing the same work for many years openly stating that she hadn't stepped foot in a physical office nor met face to face with foster parents for as long as she could remember. Ms. Whitlow was never asked, nor was it ever expected, that rate assessors went into the field, but Defendants did not even recognize Ms. Whitlow was performing this job because she was operating under an inaccurate job description. Defendants refused to update her job description and refused to conduct an interactive dialogue with Ms. Whitlow to learn what Ms. Whitlow's job actually entailed. *See* Exhibit AK, establishing Ms. Whitlow's job performing rate assessments.

168. Plaintiff Tracie Dumas was told in emails on September 22, 2021, that she had numerous job duties, such as being the main receptionist, ordering office supplies and receiving those supplies, ordering and receiving janitorial supplies, drive four state cars weekly to keep the battery alive, receive deliveries from UPS or FedEx, PPE receive and distribute, and weekly mail pickup. Exhibits AL and AM. However, Ms. Dumas's position description had none of these duties listed. Exhibit AN.

COMPLAINT

49

169. The arbitrator in *Hone v. WDFW*, *infra,* specifically rejected relying on a job description in lieu of dialogue. Exhibit AO at 10-11. Commenting on the use of job descriptions, the arbitrator stated, "[WDFW] failed to afford [employee] the individualized consideration of his religious accommodation request that is required by law." *Id.* at 16.

170. Even an infinite number of risks must be weighed against the burden of accommodation and do not, on their own, stand as a basis to violate federal and constitutional law. *See Zimmerman,* Case No. 3:22-cv-05960, (W.D. Wash. Nov. 9, 2023) (finding that even if unvaccinated posed a risk of spreading the virus, this did not answer the question of whether plaintiffs could be accommodated).

171. Because Defendants unilaterally denied accommodations without a discussion, Defendants did not balance the risk with the ability to accommodate. Defendants could not possibly have identified an undue hardship associated with each potential accommodation without this balancing. Thus, Defendants did not comply with the hardship standard from *TransWorld Airlines v. Hardison,* 432 U.S. 63 (1977) and reiterated in *Groff v. DeJoy,* No. 600 U.S. 447, 470, 143 S. Ct. 2279, 2281 (2023) (holding that *TransWorld Airlines v. Hardison,* 432 U.S. 63 (1977) requires not just a *de minimis* burden, but employer must show "that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business").

172. Accommodations such as job sharing, job shifting, telework, masking, testing and social distancing were all potential accommodations for each Plaintiff that Defendants refused to discuss or even consider.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

173. Defendants used "stop gap" measures rejected by both civil judges and arbitrators, *supra,* believing rejection of all accommodations was justified because of "the grave danger that COVID-19 poses to unvaccinated workers obliges the agency to act as quickly as possible." *BST Holdings,* 17 F.4th at 616.

174. Indeed, this "stop gap" measure was demonstrated when DCYF forced individuals to vaccinate even if they had tested positive for COVID-19 before the termination date, ignoring standard medical practice to wait a period of time before vaccination.

175. Without an interactive dialogue, Plaintiffs had no ability to dispute the undue burden that Defendants summarily concluded existed.

176. This claim of undue burden is a factual issue. *Suarez v. State,* 23 Wash. App. 2d 609, 635, 517 P.3d 474, 488 (2022), *rev. granted in part, denied in part,* 200 Wash.2d 1026 (Feb. 8, 2023) (No. 101386-8) (demanding a due process determination regarding its validity).

177. Undue burden is an analysis required by application of the Proclamation to each Plaintiff; the Proclamation itself did not declare that unvaccinated employees created an undue burden on each agency but left the undue hardship analysis to each agency in order to comply with WLAD and Title VII.

178. At minimum, undue hardship required a *dialogue* with each Plaintiff, not a universal assertion by Defendants. The claim that Plaintiffs "posed a risk" that caused an "undue hardship" on Defendants is a question of fact that cannot be decided by mere allegations by Defendants but could only be determined after a dialogue with each Plaintiff

discussing essential job functions and potential ways to resolve the conflict between their sincerely held religious belief and the taking of the vaccine.

179. Defendants made no effort to resolve this conflict. *See Suarez v. State,* 23 Wash. App. 2d 609, 517 P.3d 474 (2022), *rev. granted in part, denied in part,* 200 Wash.2d 1026 (Feb. 8, 2023) (No. 101386-8).

180. No evaluation had taken place outside of Defendants' own determination, typically at an HR location hundreds of miles away from each of Plaintiffs' work sites, by individuals who were not familiar with the jobs they critiqued, the workspace environment, or the job duties unique to each Plaintiff. They never engaged Plaintiffs in a discussion to reach their unilateral determination.

181. There was no discussion of safety issues and how accommodations could alleviate risk.

182. There was no discussion of essential functions of anyone's job before denying accommodation.

183. There was no discussion regarding workplace environment to individualize the decision before denying accommodation.

184. The granting of nominal religious exemptions was meaningless given the overwhelming denial of accommodation to those granted a sincerely held religious belief. DCYF approved 94% of religious exemption requests, but then only approved 4.9% of religious accommodations for religious objectors in the outlying areas (3/61) and, coincidentally, 37% of religious exemptions for DCYF Headquarters (105/279). Thus, approximately 95% of religious objectors from DCYF Echo Glenn, Green Hill and Naselle were denied an accommodation, and 62.5% were denied an accommodation from Headquarters, an

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

overall denial rate of 69%. Exhibit P. When DCYF terminated an individual in a specific position because of an alleged inability to accommodate, Defendants would then advertise that same position as having an available religious accommodation, when, in fact, Defendants had already concluded accommodation did not exist. Exhibit AQ.

185. DCYF granted disparately higher accommodation to medical/secular exempted employees as opposed to religious objectors, with approximately 14 approved accommodations and 9 denied. Exhibit P.

186. "The risk posed by an unvaccinated, exempt employee is the same regardless of the reason that the employee obtained the exemption. In other words, an employee exempt from the Mandate for medical reasons presents the same risk of COVID-19 transmission in a high-risk role as does an employee exemption from the Mandate for religious reasons…Accordingly, giving priority consideration to employees in high-risk roles for secular exemptions over those with religious exemptions is likely to fail strict scrutiny." *UnifySCC v. Cody*, 2022 WL 2357068 (N.D. Cal. June 30, 2022).

187. "[I]t remains plausible that the Mandate's medical exemption creates comparable risks to those that would be created by religious exemption, warranting strict scrutiny." *Lowe v. Mills*, 68 F.4th 706, 717 (1st Cir. 2023), *petition for cert. filed* (U.S. Aug. 16, 2023) (No. 23-152).

188. In actuality, Defendants refused to perform their job and did so without legal authority in their own personal capacities with animus towards religious objectors, acting outside the scope of their authority in violating Plaintiffs' constitutional rights for which there is no immunity.

189. There is no reason that the list of accommodations that were allowed for medically exempt employees (mask use, eye protection, six feet distancing, two COVID tests weekly, and exclusion from working with specific individuals) could not be equally applied to unvaccinated who provided no greater threat as a religious objector than a medical objector.

190. Each presented the same risk of reinfection and Defendants discriminated against religious objectors by favoring medical accommodations over religious accommodations. *See* discussion, *supra*; *see also Garvey, et al. v. City of New York, et al.,* Index # 85163/2022 at *12 (Supreme Court of New York, County of Richmond, October 24, 2022) ("The vaccination mandate for City employees was not just about safety and public health; it was about compliance. If it was about safety and public health, unvaccinated workers would have been placed on leave the moment the order was issued. If it was about safety and public health, the Health Commissioner would have issued city-wide mandates for vaccination for all residents…If it was about safety and public health, no one would be exempt.")

191. There was no burden identified by Defendants that resulted in any economic cost to the Defendants. *See Groff v. DeJoy,* 600 U.S. 447, 143 S. Ct. 2279 (2023), in which the U.S. Supreme Court held that, in accordance with long-standing precedent *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), Title VII requires an employer that denies a religious accommodation to show that the burden of granting an accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Groff*, 143 S. Ct. at 2281, 2295 (quoting *Hardison,* 432 U.S. at 83 n.14) (with emphasis

on "substantial expenditures," or "substantial additional costs.") *Groff,* 143 S. Ct. at 2295. Defendants fail this standard.

192.    Indeed, even OFM fully accommodated their employees through masking and distancing, *supra,* and extended that accommodation for a year after the October 18, 2021, deadline. Exhibit AR. OFM accommodated all OFM staff, allowing direct interaction with the public, having found no undue burden, while Defendants denied even considering the same accommodations utilized by OFM.

193.    In granting accommodations, "courts must apply the test to take into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff,* 143 S. Ct. at 2295. Defendants neither applied the test nor considered any factors other than vaccination.

194.    Title VII, which Washington law mirrors when interpreting WLAD, *Kumar v. Gate Gourmet, Inc.* 180 Wash.2d 481 (2014), likewise "requires that an employer 'reasonably accommodate' an employee's practice of religion, not merely that it assess the reasonableness of a particular accommodation or accommodations." *Groff,* 143 S. Ct. at 2296. Defendants neither accommodated nor made an assessment of any particular accommodation.

**2.    Defendants wrongly relied on job descriptions in lieu of individualized dialogue.**

195.    Defendants relied on job descriptions to determine employment status, not an interactive dialogue, a position that was rejected by an arbitrator in in John Hone Arbitration and Decision and Award, PERC No. 134 845-P-22, Exhibit AO, at 10-11.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

196. Defendants not only wrongfully relied on job descriptions, they fabricated public exposure job duties in order to further their discriminatory intent to terminate religious objectors.

197. Defendants reviewed job descriptions in lieu of a dialogue with Plaintiff and determined that any individual who Defendants claimed had any potential for public exposure was automatically terminated without vaccination, a position that is *not* in accordance with the Proclamation or WLAD. Neither the Proclamation or WLAD requires no public exposure, nor do either authorize a review of a job description in lieu of an interactive dialogue. This defies the law, which the arbitrator determined in the Hone decision. *See* Exhibit AO.

198. Similarly, Defendants here also wrongfully concluded public exposure based only on Plaintiffs' job descriptions, wrong in itself, but further complicated by the fact that Defendants misinterpreted those job descriptions or relied on grossly outdated job descriptions.

199. For example, Defendants terminated Plaintiff Stephanie Seagraves because they claimed she needed to pick up mail, *supra,* but this was not an essential function of her job. Defendants also forced Ms. Seagraves to sign a "new job description" weeks before her termination that removed any remote capability, despite the fact she had been directed to work remotely. Exhibit AS.

200. Defendants fabricated public exposure not found in a job description by claiming Plaintiff Brons *may* need to attend foster appreciation gatherings, a pretext for

termination, or that they *preferred* she have some face-to-face contact with social workers, which could easily have continued via ZOOM until the emergency ended.

201. The essential functions of Plaintiff Rowland's job were all able to be performed fully remotely. The only component requiring contact was monthly health and safety visits that could have been reassigned to the field health and safety social worker whose sole job was to perform those monthly visits.

202. Defendants created public exposure by claiming Plaintiff Ahern needed to check the mail and items from the court that were not emailed to Defendants, but like most court documents, this was predominantly and almost exclusively digitized.

203. At the time of termination, Plaintiff Michelle Whitlow was performing the job of a Foster Care Rate Assessor, which had already been predominantly a teleworking position for years. Ms. Whitlow's coworker, Liana Wilson, had been doing the same work for many years openly stating that she hadn't stepped foot in a physical office nor met face to face with foster parents for as long as she could remember. Ms. Whitlow was never asked, nor was it ever expected, that rate assessors went into the field, but Defendants did not even recognize Ms. Whitlow was performing this job because she was operating under an inaccurate job description. Defendants refused to update her job description and refused to conduct an interactive dialogue with Ms. Whitlow to learn what Ms. Whitlow's job actually entailed. *See* Exhibit AK, establishing Ms. Whitlow's job performing rate assessments.

57

204. Defendants relied entirely on a PDF job description for Plaintiff Doughtery that stated the job may require visiting a client, even though Ms. Doughtery had never visited a client in 18 years on the job.

205. Public exposure was fabricated as a pretext for termination. Defendants required Plaintiff Tracie Dumas to come to the office occasionally to assist with mail pickup from the post office, as delivery stopped due to the fact everyone teleworked. This created public exposure to justify termination, without consideration that others could have performed this duty. Defendants also required Ms. Dumas to assist with FedExing PPE to other DCYF offices, yet another public exposure fabrication that served as a pretext for termination. Ms. Dumas had to collect vehicle mileage sheets, which could have easily been emailed to her.

206. Prior to and during COVID-19, Plaintiff Yvette Hessler often performed emergency tasks remotely when a facilitator was unavailable, with no concerns by Defendants. There was no concern by Defendants for this remote work, yet Defendants relied on objecting to remote work to accommodate Ms. Hessler when it suited their discriminatory purposes.

207. Any accommodation process alleged to have occurred, despite no evidence of any dialogue, was not generally applicable in that it left all discretion in the hands of Defendants to decide whether to find public exposure and deny an accommodation. *See Fulton v. City of Philadelphia,* 141 S. Ct. 1868 (2021) (applying strict scrutiny to ordinance providing for exemptions in commissioner's "sole discretion."); *see also Kane v. DeBlasio,* 19 F.4th 152 (2nd Cir. 2021) (upholding vaccine mandate under rational basis review but enjoining accommodations procedures under strict scrutiny in Free

Exercise challenge to New York City school employee COVID-19 vaccine order under general applicability analysis) (citing also *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 884 (1990) (an unemployment compensation system with discretionary, individualized exemptions "lent itself to individualized government assessment of the reasons for the relevant conduct" and was thus not generally applicable)).

208.  Thus, while it is presumed the Proclamation was valid, Defendants assumed full discretionary authority in awarding exemptions and accommodations when applying the mandate to Plaintiffs. Defendants alone determined public exposure, authority they did not have, and for which they fabricated a public exposure requirement not found in the law. This full discretionary authority demonstrates that Defendants did not generally apply the Proclamation but utilized their own discretion to discriminate against Plaintiffs.

209.  Defendants, in essence, created a mandate within a mandate that violated the terms of the Proclamation they were to follow.

210.  Accommodation was never possible because it was never discussed.

211.  As discussed, many terminated Plaintiffs in the same jobs doing the same job functions as others who were allowed to telework, evidences the discriminatory and arbitrary nature of Defendants' actions. Many Plaintiffs were denied telework and terminated at the same time their office was continuing to work predominantly through telework, *supra.*

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

212. Select Plaintiffs were also hired with full accommodation despite their unvaccinated status. For example, Plaintiff Yvette Hessler was hired by the Office of Public Defense after her termination in a job that required public exposure performing home studies.

213. "Before [restricting religious practice due to COVID-19], we have a duty to conduct a serious examination of the need for such a drastic measure." *Brooklyn v. Cuomo,* 141 S. Ct. 63, 68 (2020).

214. Defendants cannot articulate that they provided this dialogue or that they identified any burden they would have suffered had they accommodated Plaintiffs.

215. Defendants did not even follow the law of *Loudermill,* denying all accommodations regardless of any hardship it would pose. "Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, **it can avoid the problem by suspending with pay**." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 544 – 45 (emphasis added).

216. The pandemic was an emergency and only temporary. Defendants utilized a permanent solution to a temporary problem.

217. At no time prior to denying accommodation did the Defendants consider leave with or without pay in accordance with the *Loudermill* decision.

218. Plaintiffs who requested *Loudermill* were either denied or ignored, including, but not limited to, Plaintiffs Seagraves, Ramirez, Whitlow, and Hessler, as Defendants either ignored the request entirely, or stated those hearings were only for "disciplinary" separations, not "non-disciplinary" ones.

219. Any rare instances of meetings with Plaintiffs were held **after** the investigation was concluded and final determination letters sent to each Plaintiff, with no witnesses allowed and no ability to record, held after Plaintiffs were already told they would be terminated, with no right of appeal. These meetings were merely theatrical displays with no meaningful import.

220. Additionally, Plaintiffs did not break any rules but fully complied with the language of the Proclamation by submitting requests for exemption, as required, making their "for cause" termination illegal. There was no cause for discipline and termination, and exercising one's religious freedom cannot be the basis for termination.

**3.    Defendants wrongly declared an "essential job function" that included the duty to keep everyone safe.**

221. Defendants imputed to each Plaintiff a new essential function of their job that they had to create no risk of COVID-19 transmission.

222. This was a ruse for termination, as elimination of all risk of COVID-19 transmission is an impossible standard. This is evident by the failure of the vaccine to prevent infection.

223. Defendants cannot impute an impossible job function to each Plaintiff and call it "essential." They likewise cannot impute that standard to religious objectors and then terminate them but allow secular objectors the ability to work even though those secular employees clearly did not meet the standard when they reinfected.

224. This convolution of imputing a job function of keeping everyone safe, when that job function had nothing to do with an employee's essential job functions, and then holding different classes to different standards in promoting this imputed standard, is quintessential disparate treatment.

225. This rewriting of each Plaintiff's job description to incorporate "eliminating all risk of COVID-19 transmission and/or infection" was a discriminatory ruse to terminate religious objectors in violation of Plaintiffs' contract and civil rights.

226. Preventing all risk of any exposure to COVID-19 is not an essential function of any of the Plaintiffs' jobs from which they were terminated.

227. Defendants apparently considered the public interest in increased vaccination against the COVID-19 virus, but they gave no consideration to the public interest in enforcement of civil rights statutes. *Keene v. City,* No. 22-16567 (9th Cir. May 15, 2023), 2023 WL 3451687 (citing *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138-39 (9th Cir. 2009)); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.,* 630 F.3d 1153, 1166-67 (9th Cir. 2011) (concluding that public interest was served by requiring entities to comply with the Americans with Disabilities Act).

228. Each Plaintiff was fully capable of performing all essential functions of their job even unvaccinated.

**4.    Reassignment cannot circumvent an accommodation process:**

229. Reassignment was considered the only option for Plaintiffs, but reassignment is not an accommodation, but a last resort in the event the accommodation process fails.[11] Defendants cannot skip the accommodation process and move straight to reassignment, which is what occurred.

230. Defendants have claimed that several Plaintiffs did not participate in the reassignment process by failing to submit a resume, however, those Plaintiffs, like all Plaintiffs, were

---

[11] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D (last visited January 30, 2024).

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

denied a legitimate accommodation process *prior to* resorting to reassignment. Plaintiffs rightly asserted their constitutional rights to a transparent and legitimate interactive dialogue to discuss Plaintiffs' working environment, business requirements for workplace safety, agency needs, and essential functions of each Plaintiff's job duties to determine whether a reasonable accommodation could be made without imposing an undue burden. Defendants claim they evaluated all of these factors, but they did so in record time without ever discussing any issue with any Plaintiff.

231. Additionally, those few Plaintiffs who were placed in a reassignment were reclassified from a permanent employee to a temporary employee, without cause, and without having done anything wrong or broken any rule. This reclassification to a temporary employee thus gave pretext to terminate once the accommodation was open for renewal. Accommodations can involve demotions, but they cannot be a pretext to change an employee's classification to temporary and thus serve as a pretext for eventual termination down the road.

232. Moreover, in applying for a reassignment, Plaintiffs could only submit a resume with their general skills without tailoring their resume to any specific job. Defendants did not provide a list of available jobs such that each Plaintiff could highlight their experience, education and background that supported the duties of the job being offered. Defendants simply focused on each Plaintiff's current job, which could have been outdated or not reflective of real duties, to determine whether those duties would meet the duties of the reassignment. This methodology greatly hindered Plaintiffs' ability to compete for jobs for which they may have been fully qualified but never considered.

233. Religious objectors who were denied accommodation and reassigned into a temporary position, usually at great loss of pay, were able to stay in that position no longer than approximately six months. They were all terminated under the claim of "change in business practice."

234. In many instances, Defendants denied reassignment or flatly ignored Plaintiffs who sought a reassignment, never responding to emails requesting that avenue.

   **5.    Defendants knew the benefits of natural immunity, and knew the vaccine failed to prevent transmission and infection of COVID-19 – the stated reason behind mandatory vaccination.**

235. Many Plaintiffs had demonstrable natural immunity through a positive COVID-19 test or positive antibody test.

236. Defendants ignored the science, despite evidence of vaccine failure, and despite science regarding natural immunity.[12]

237. Defendants demanded vaccination regardless of any data or science presented to them.

238. Dr. Chris Murray, Director of the Institute for Health Metrics and Evaluations (IHME) and Chair of Health Metrics Sciences at the University of Washington, stated in an interview with Meghna Chakrabarti, host of NPR's On Point,[13] that studies conducted prior to the termination of Plaintiffs that found "protection from natural immunity is equivalent or actually slightly better than two doses, specifically of the mRNA vaccine," did not surprise him. Exhibit AT.

---

[12] Defendants likewise ignored the science behind the effectiveness of herd immunity. DCYF had a 98.8% and 99.5% vaccination rate at two of four locations, and 100% vaccination rate at remaining sites, Exhibit P.

[13] https://www.wbur.org/onpoint/2023/03/08/understanding-the-impact-of-natural-immunity-to-covid-19-on-u-s-health-and-politics?mkt_tok=NTI3LUFIUi0yNjUAAAGKedF7YcGYnuVSfof9MkDb_0n-FRFrzIKBsRIUnNFkUzwgUnva4jDaunex_vDZVXd3SgK1R1g5rkKHHgTw_5UQdOYAdMJ0EP-alyCvHLo1-A aiired March 8, 2023 (last visited January 30, 2024).

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

239. Dr. Murray stated, "The fact that it was as good as or actually slightly better than vaccination is in keeping with what we would expect sort of immunologically. The surprise was the duration [of natural immunity], that ten months you still had 88% protection. So that's really good news in a sense for us all." *Id.*

240. Dr. Murray likewise stated that "we thought that the position from the CDC was somewhat extreme in thinking that there wasn't protection" from natural immunity, and that "most of the scientists in Europe advising governments were accepting past infection as is equivalent to vaccination in terms of people being able to go out, go to restaurants, etc." *Id.*

241. Dr. Murray agreed that the "concept of natural immunity did become very politicized with no benefit to anybody." *Id.*

242. Defendants were clearly aware of the science regarding natural immunity, particularly when that science was being published by the State's largest medical hospital and research facility.

243. Defendants knew or should have known of a highly publicized, massive group Israeli study released in August 2021,[14] which found exceedingly low reinfection rates for people previously infected with COVID-19. These positive tests were historical and were presented after full recovery. Most interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to **13 times more likely to**

---

[14] *See* Svian, Gazit, et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections, medRxiv* https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1 (last visited January 30, 2024). *See also* Exhibit AU.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1  **contract the virus than those who were previously infected with the virus,** and that

2  "natural immunity convers longer lasting and stronger protection against infection.[15]

244. It is unclear what data Defendants relied upon in denying natural immunity or why the published studies presented were insufficient.

245. Defendants also denied testing as an accommodation.

246. Widely published adverse reactions to the shot were well known and concerning.[16] Defendants knew or should have known based on these published reports that in December 2020, 26% of the population that received the Pfizer vaccination experienced side effects. Exhibit AV.

247. Defendants knew or should have known based on these published reports that in May 2021, prior to the termination of Plaintiffs, of at least a dozen *local cases* of myocarditis or pericarditis following COVID-19 vaccination released by Public Health – Seattle &

---

[15] *Id.*

[16] When Governor Inslee issued his Covid-19 vaccine mandate, the VAERS data for the Covid-19 vaccine shots showed over a hundred thousand vaccine-related deaths or hospitalizations, as well as thousands of heart attacks, myocarditis and pericarditis episodes, permanent disability in the tens of thousands and other life-threatening episodes. https://openvaers.com/covid-data. *See also* https://vaersanalysis.info/2022/01/14/vaers-summary-for-covid-19-vaccines-through-01-07-2022/ (last visited January 30, 2024). The VAERS system suffers from gross underreporting by between 5 and 10 times and as-high-as 40 times. Center for Disease Control and Prevention Morbidity and Mortality Weekly Report, COVID-19 Vaccine Safety in Children Aged 5–11 Years — United States, November 3–December 19, 2021 (CDC admits that VAERS under-reports by 4.5 times) (December 22, 2021); Electronic Support for Public Health–Vaccine Adverse Event Reporting System (ESP:VAERS), a Harvard Pilgrim Study (2010) (Stated that less than 1% of the adverse events were reported in the VAERS system.)

The CDC also reported as early as September 22, 2020, that a "Preliminary list of VAERS [adverse events of special interest] AESI's identified a large list of serious and life altering adverse reactions to the COVID-19 vaccines, including death, myocarditis/pericarditis, thrombocytopenia, multiple sclerosis, Guillain-Barre syndrome, seizures/convulsions, strokes, autoimmune disease, chronic inflammatory demyelinating polyneuropathy, encephalitis, myelitis, meningitis, Kawasaki disease, and acute myocardial infarction, to name just a few. Exhibit AW; also at: https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2020-09/COVID-03-Shimabukuro.pdf. *See also* https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2020-10/COVID-Anderson-508.pdf. (last visited January 30, 2024).

66                    **ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

1
2
King County. Exhibit AX. This number of adverse reactions *alone* historically could potentially end vaccination.[17]

3
4
5
248. Most Plaintiffs had family members or friends who experienced adverse effects to the shot, including life-altering effects that continue to this day.[18]

6
7
8
9
10
249. For example, Plaintiff Paulene Doughtery's mother suffered giant cell arteritis, an inflammation of vessels in the head, following vaccination, while a 54-year-old extended family member was found to have died suddenly of a presumed heart attack in his sleep. Ms. Doughtery's husband, a nurse, also witnessed an otherwise healthy teenager with no history of drug use other than vaccination suffer a heart attack.

11
12
13
14
15
16
250. Plaintiff Tony Lacey's co-worker, J.L., was diagnosed with blood clots following vaccination, later expressing regret at taking the forced vaccination to keep his job. Mr. Lacey also had a personal friend, K.R.E., who had a stroke requiring surgery, and has been in and out of the hospital for two and a half years since her vaccination. Likewise, K.R.E. expresses regret over her forced vaccination.

17
251. Plaintiff Benjamin Lupo was also aware of co-worker J.L.'s blood clots.

18
19
20
21
22
23
24
25
[17] *See* https://www.cdc.gov/vaccinesafety/concerns/concerns-history.html (last visited January 30, 2024), for a list of vaccines that have been investigated, halted and/or pulled due to adverse reactions, CDC stating that "the possibility of an association of [the adverse reaction] however small, necessitated stopping immunization until the issue could be explored." *Id.* In the case of a rotavirus vaccine and its association with intussusception, where "[a]t first, it was not clear if the vaccine or some other factor was causing the bowel obstructions...CDC quickly recommended that use of the vaccine be suspended and immediately started two emergency investigations," which revealed that the vaccine did cause intussusception "in some health infants younger than 12 months of age who normally would be at low risk for this condition." *Id.* The CDC likewise halted the swine flu vaccination push in 1976 after significant adverse reactions were noted, stating "[u]ltimately, understanding how decisions were made during this program; how risks were weighed; and how the public, media, and industry responded…." https://www.cdc.gov/museum/online/story-of-cdc/h1n1/index.html (last visited January 30, 2024). The politicized nature of this vaccine is demonstrated through the fact that when even 12 local cases of severe heart impairment directly linked to the vaccination were identified, no action was taken to protect those forced to take the same shot or lose their employment.

26
[18] Due to medical privacy, individuals referenced who experienced vaccine injuries will not be identified at this stage.

252. Plaintiff Yvette Hessler's supervisor developed tinnitus from the vaccine.

253. Plaintiff Kristin Rowlan worked with a CPS Investigator, A.J., who was forced to be vaccinated against her will and became seriously ill and contracted COVID-19 several times.

254. Plaintiff Taylor Schrodt's coworker fainted for multiple minutes following her vaccination and became very ill for days following her event. She is now frequently ill and misses multiple hours of work each month.

255. Plaintiff Sandy Ruch had two co-workers at Naselle Youth Camp who had adverse reactions. One was hospitalized for blood clots and the other co-worker called in sick due to her body in such pain after her shot that she was unable to move after receiving her second dose.

256. Plaintiff James Wilson witnessed a number of adverse events by friends and relatives. One friend had a heart attack after the shot and another friend, who also worked at DCYF, developed blood clots in his legs. Mr. Wilson's ex-wife's new husband had a heart attack and died after his shot.

257. Plaintiff Stephanie Seagraves' nurse friend, J.M., 21-years-old had a stroke instantly upon taking the vaccine, suffered heart problems, cancer throughout his body and died of blood clots, all within six months of taking the vaccine, when just a few months prior to taking the vaccine, J.M. had passed his annual health clearance for his job with no health issues.

258. Plaintiff Tracie Dumas had a friend who developed myocarditis within a year of taking the vaccine.

259. Plaintiff Melinda Alexander was told during her exit interview that a Family Team Decision Making Facilitator (FTDM) suffered near death following her first shot and she was unable to take the second shot and was terminated by DCYF for failure to comply.

260. Plaintiff Laura Cook is aware of two colleagues from DCYF who suffered adverse reactions to the shot, one of which was reported to management.

261. Plaintiff Charlene Ramirez' colleague J.F. took the shot at the last minute to save her job and has had sinus issues ever since.

262. Many of the Plaintiffs, including Michelle Whitlow, are aware of a colleague, Z.P., who suffered severe and permanent heart damage immediately after his forced vaccination by DCYF. Following a highly respectful attempt to request supportive compassion from fellow union members for Z.P. after his vaccine injury, WFSE President, Mike Yestramski, replied directly to Ms. Whitlow on the WFSE Facebook page, claiming Z.P. was not a union member, when, in fact he was. Ms. Whitlow was then blocked from commenting by the page moderators and her posts and comments were deleted from the page for speaking out against the safety of the vaccine or seeking further support from her union, even after the moderators had previously posted that no posts about the vaccine would be deleted. Based on information and belief, the Union President was acting under direction of DCYF leadership in trying to suppress all awareness of adverse effects of the vaccine.

263. Plaintiff Mary Ahern had multiple family members who developed circulation and memory problems following the shot, as well as hallucinations without explanation. Additionally, colleagues, including M.S., a parole officer, openly acknowledged adverse

reactions from the shot. This individual also reinfected with COVID-19 but kept his employment.

264. Defendant Hunter performed his acts of personal bias and discrimination against all Plaintiffs in violating their constitutional rights by acting in conflict with and outside the scope of his authority granted by the Proclamation, *see Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689-91, 69 S. Ct. 1457 (1949); *see also United States v. Yakima Trial Court,* 806 F.2d 853, 859 (9th Cir. 1986), where the Ninth Circuit held that any time a government agent commits an unconstitutional act, the agent is necessarily acting outside the scope of authority. Thus, unconstitutional acts are by definition outside the scope of a government agent's official capacity. *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1332-33 n.3 (9th Cir. 1987).

265. Defendant Hunter had a duty to perform this dialogue with Plaintiffs but refused to perform those duties due to his animosity towards Plaintiffs, who each had sincerely held religious beliefs.

266. Defendant Hunter's actions were taken in his personal capacity and caused tremendous anxiety and loss to each Plaintiff.

267. Defendant Hunter was not acting pursuant to state law, as neither the Proclamation nor any other law permitted discrimination against Plaintiffs by refusing to perform the interactive dialogue with each in order to identify an accommodation that did not unduly burden Defendants.

268. Defendants ignored all Plaintiffs' efforts to understand why secular employees were allowed to reinfect others, but unvaccinated healthy employees were required to eliminate all risk, despite negative tests and natural immunity.

269. Defendants' refusal to consider these risks of reactions, which were real, life-threatening, and widely known, evidences their discriminatory intent against religious objectors.

270. Because the fully vaccinated were contracting and spreading the virus, requiring a vaccination of religious employees for the stated purpose to stop the spread of the virus was arbitrary and capricious.

271. These vaccines were developed quickly to purportedly protect those who were at highest risk of getting seriously ill from COVID-19, especially the elderly and those with multiple co-morbidities.[19]

272. Pfizer officials have admitted that its vaccine was not tested for efficacy at preventing transmission or infection, and the Food and Drug Administration likewise admitted that the vaccines were not licensed or authorized for prevention of infection or transmission, nor were clinical trials designed for such.[20]

273. It is now universally admitted and fully understood that the vaccinated can contract and transmit COVID-19.

---

[19] Finding most deaths for COVID-19 occurred in nursing homes, and that the inferred median infection fatality rate in locations with a COVID-19 mortality rate lower than the global average is low (0.09%). "If one could sample equally from all locations globally, the median infection fatality rate might even be substantially lower than the 0.23% observed in my analysis." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7947934/pdf/BLT.20.265892.pdf/ (last visited January 30, 2024).

[20] Dr. Peter Marks, Director, Center for Biologics Evaluation and Research with the Food and Drug Administration, stated, "The vaccines are not licensed or authorized for prevention of infection with the SARS-CoV-2 virus or for prevention of transmission of the virus, nor were the clinical trials supporting the approvals and authorizations designed to assess whether the vaccines prevent infection or transmission of the virus." Exhibit AY, at 12. Also available at: https://www.regulations.gov/document/FDA-2023-P-0360-0191 (last visited January 30, 2024).

COMPLAINT

71

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

274. As proof became available regarding the failure of the vaccine, Defendants continued to ignore that data and demanded vaccination without accommodation.

275. A statement from CDC Director Rochelle P. Walensky, MD, MPH, was issued and publicly available on the CDC website on July 30, 2021, before Washington Governor Jay Inslee's Proclamation 21-14 *et seq.,* that stated, "…data were published in CDC's Morbidity and Mortality Weekly Report (MMWR) demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, **vaccinated people infected with Delta can transmit the virus.**"

276. Recorded "breakthrough" cases (fully vaccinated individuals contracting COVID-19) in Washington State from July 17, 2021, to July 9, 2022, alone totaled 636,766, with a majority of these breakthrough cases in the 20-49 years age group (74 percent). Exhibit AZ. These cases do not represent infection in the typical vulnerable population.

277. The CDC also released a complete report of rising breakthrough cases in a report dated August 13, 2021, Exhibit BA, which was also recognized by the Washington State Department of Health (DOH) in a news release recognizing extensive breakthrough cases recognized as early as March 29, 2021. *Id.* at 8.

278. The same report quoted a study from the Ministry of Health in Israel stating that there were higher breakthrough rates and lower vaccine efficacy against infection for persons vaccinated in the first two months of 2021, well before the termination date of Plaintiffs. *Id.* at 8.

279.  These findings were also supported by retrospective cohort studies of vaccinated persons with Pfizer in large health care systems, also cited by the CDC, which concluded that there was a 2.3-fold increased risk of breakthrough infection among persons vaccinated during that same period, and a higher breakthrough infection rate among those who received a second dose within a certain period. *Id.*

280.  The CDC report, *id.,* noted "increased transmission," but also "potential reduced antibody efficacy, and that, with respect to the Delta variant, "[f]ully vaccinated people with Delta breakthrough infections can spread virus to others." *Id.* at 11.

281.  Defendants were duty bound to follow advice from CDC, as well as the State's top medical hospital and research facility. For example, at the August 13, 2021, public Town Hall webinar, Dr. John Lynch, Medical Director of Harborview's Infection Control, and Professor, Department of Medicine, Division of Allergy & Infectious Diseases, discussed an outbreak of 230 health care workers at UCSF over the summer, where 75-80% were fully vaccinated. Exhibit BB.

282.  This data was certainly available to Defendants.

283.  At that same webinar on August 13, 2021, before terminations, Dr. Santiago Neme, recently promoted as the new UWMC Medical Director, likewise stated that, "[w]e know that vaccinated people can…get infected and we also know that they can transmit to others." *Id.* at 15. This data from the State's leading medical research hospital was clearly available and published for Defendants' benefit and use.

284.  At the August 20, 2021, Town Hall webinar, Dr. Seth Cohen, Medical Director of Infection Prevention, after acknowledging "all of the breakthrough cases that we've had,"

Exhibit BC, at 18, stated "the vaccines are really designed to prevent disease, not infection[,]" and admitting that "all these breakthrough infections are really community acquired infections," *id.* at 19.

285. This statement is an admission that PPE protocol in the hospital was successful, as infections and transmission of the virus were occurring in the community, not traced to health care workers generally, or to Plaintiffs, specifically. Utilization of PPE would have been a reasonable accommodation for Plaintiffs without any hardship to Defendants, and, in fact, PPE worked with 100% effectiveness for 18 months with no COVID-19 transmissions or infections traced to any Plaintiff.

286. Defendants never compared the efficacy of masking and distancing (or any other accommodation) to the efficacy of vaccination based on each Plaintiff's work environment and essential duties.

287. A peer-reviewed May 2021 published study of breakthrough infections of COVID-19 in Washington State, co-authored by three UW physicians,[21] found that the vaccine did not stop their own newly vaccinated staff from catching new strains of COVID-19, with the earliest COVID-19 diagnosis 39 days after the second shot in February 2021. Exhibit BD. "Across 20 vaccine breakthrough cases detected at our institution, all 20 (100%) were due to variants of concern (VOC)….When compared to 5174 contemporaneous samples sequenced in our laboratory, VOC were significantly enriched among breakthrough infections."

---

[21] Seth Cohen, Chloe Bryson-Cahn, John Lynch.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

288. The failure of the vaccine is highly relevant to the ability of the Defendants to find an accommodation for each Plaintiff; as the failure of the vaccine became obvious, the accommodations available to each Plaintiff that were at least equal to, if not better, than vaccination to stop the spread of the virus, became more readily available. Defendants conducted no analysis to balance these interests.

289. Many of the Plaintiffs had personal knowledge of co-workers who had been vaccinated and who reinfected with COVID-19 prior to termination. Plaintiffs brought this to the attention of Defendants but were silenced, with no balancing by Defendants of the efficacy of vaccination versus accommodation.

290. For example, Plaintiff Tony Lacey, saw more than half his colleagues who were vaccinated become reinfected with COVID-19. One individual, D.E., received the vaccine, became reinfected, and has since passed from complications.

291. Plaintiff Stephanie Seagraves' supervisor, T.M., was vaccinated and reinfected with COVID prior to Plaintiff's termination, but was allowed to keep her employment while Ms. Seagraves was terminated as a health risk to others and herself.

292. Plaintiff Tracie Dumas had a friend who developed myocarditis within a year of taking the vaccine. Defendants thus readily admitted that they were witnessing breakthrough cases of COVID in fully vaccinated and boosted populations, but still continued to terminate religious and medical objectors and refused to allow them to return to work.

293. Plaintiff Spencer Mooers' colleague, T.P., was vaccinated and reinfected with COVID-19 prior to Mr. Mooers' termination. She was allowed to keep her job, but Mr. Mooers was terminated as a risk.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

294.  The vaccine itself did not stop the transmission or reinfection of those who took it and thus did not further the stated purpose of vaccine policy. "The neutrality of a law is suspect if First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation." *Church of Lukumi,* 508 U.S. at 538.

295.  Defendants' actions were arbitrary and capricious when they terminated religiously exempt employees to allegedly stop the spread of the virus, but secular employees continued to transmit and spread the virus and maintain their employment.

296.  Defendants' actions were further arbitrary and capricious in allowing secular employees to telework after Plaintiffs as religious objectors were prohibited from teleworking as an accommodation.

297.  Defendants' actions were arbitrary and capricious in refusing to recognize natural immunity, which was at minimum equally effective in preventing the spread of the virus, if not better, than vaccination.

298.  At the same time Defendants were claiming that religious exempt employees could not be accommodated because the COVID-19 vaccine was too deadly and the risk of infection too high, Defendants then instituted a relaxed "return to work" policy for secular employees who tested positive for COVID-19 by allowing these secular employees to return to work five days after COVID-19 symptom onset or a positive COVID-19 test, if "their symptoms are improving and they are fever free for 24 hours without the aid of fever reducing medication." Exhibit BE. Under this policy, secular employees were allowed to reinfect and potentially spread the virus under a "return to work" accommodation that was not offered to religious objectors who were terminated.

If secular employees could return to work symptomatic, those with a religious exemption could have likewise been isolated and/or quarantined until their symptoms improved and they were fever-free without aid of medication.

299.  Additionally, this new policy offered additional accommodations to secular employees by mandating 10-day quarantine after confirmed exposure if the exposed employee "completed the primary series of Pfizer or Moderna vaccine over five months ago and has not received the recommended booster(s)," *id.* at 2. Under this policy, Defendants admitted that five months after vaccination, secular employees no longer had benefit from vaccination, but they were still allowed to maintain employment even without a booster. If secular employees could simply quarantine after their vaccine was considered ineffective, there is no reason religious objectors could not be offered similar accommodation of quarantine in order to keep their employment.[22]

300.  This disparate treatment of religious exempt employees compared to secular employees was arbitrary and capricious, treating secular employees more favorably than religious exempt employees. For example, secular employees were not required to get a booster readily available even after their vaccine efficacy waned, while religious objectors were terminated despite the inefficacy of the primary series.

---

[22] In furtherance of their arbitrary treatment of religious objectors, DCYF also allowed unvaccinated individuals to deliver services either in-home or in community, such as family therapy services, visitation services, parent education, substance use treatment, etc. A list of service providers by region can be found at: https://www.dcyf.wa.gov/services/child-welfare-providers/contracted-services (last visited January 30, 2024). Family Healing Center and Harbor Counseling, both in-home service providers, were allowed to provide unvaccinated providers in the homes of DCYF clients. Additionally, security, postal workers, and cleaning crew, as well as DCYF clients, were not required to be vaccinated. Neither were residents of Green Hill, which houses juvenile offenders and Department of Corrections inmates. And finally, foster parents were not required to be vaccinated despite proximity with vulnerable children.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

301.    Further, secular employees were allowed to continue teleworking long after Plaintiffs were denied telework accommodation and were terminated. In fact, those working in similar positions as Plaintiff Melinda Alexander were still working remotely at the time Ms. Alexander was terminated; these secular employees could visit the office voluntarily, and even client visits with foster parents and children were performed by Webex and not in-person. Numerous other Plaintiffs were terminated while their replacement and/or their department continued to telework, *supra.*

**D.    Defendants relied on biased data to support their narrative.**

302.    The data that Defendants relied upon has not been subjected to cross-examination or the ability to be disputed through contrary published and peer-reviewed science discrediting Defendants' theories. *See Firefighters4Freedom v. City of Los Angeles* (Los Angeles Cty. Super. Ct. No. 21STCV34490 (June 21, 2023)).

303.    Defendants are hiding behind their conclusions and unsubstantiated assertions regarding threats, risks, and undue burdens, without any dialogue to discuss these assertions. *See National Federation of Independent Business v. OSHA,* 595 U.S. 109, 118, 142 S. Ct. 661 (2022) (stating "COVID-19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather. That kind of universal risk is no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases.")

304.    For example, Dr. Ann Jarris, MD, a medical consultant contracted by the State to provide contact tracing for outbreaks and provide testing regiments for employers, stated, "I'm sorry for not being more political, but I am absolutely through with this. Vaccines are the

second greatest public health success since sanitation and the refusal to understand and accept the science behind the incredible job the vaccine scientists, makers, distributors, and administrators has [sic] done is nothing short of colossally stupid." Exhibit BF.

305. In fact, Dr. Jarris presented a simple graph showing that states with higher vaccination rates had lower hospitalization, to which she summarily concluded the inverse ratio was solely due to vaccination, without an analysis of the factors involved in those statistics.

306. Plaintiffs have not been allowed to discuss any of these studies, reports, or theories Defendants relied upon in denying accommodations. Consequently, Defendants never considered other data in balancing the real threat posed by Plaintiffs.

307. Dr. Jarris's opinion admitted her obvious financial involvement in the business of COVID-19. "I am making good money running testing programs for employers so I have a huge disincentive to advise against it." *Id.*

308. Defendants were interested in supporting their predetermined decision to terminate religious objectors, not in obtaining objective evidence of the inefficacy of the vaccine and balancing that inefficacy with accommodations available.

309. The rhetoric of calling those who did not support COVID-19 vaccination "colossally stupid," *id.*, fueled the discriminatory treatment of those with sincerely held religious objections.

310. Defendants relied on the rhetoric of admittedly biased individuals instead of seeking objective data from those who did not have a financial incentive in the vaccines.

311. Defendants had a duty to seek medical advice from across the scientific spectrum, not just those who reinforced their position. And Plaintiffs had the right to question those

weakly-based conclusions by presenting contrary evidence in an interactive dialogue that discussed the accommodations available.

312. This is the purpose of interactive dialogues, which Defendants denied.

313. Defendants failed to provide this balancing of real threat with the hardships presented by various accommodations.

314. Defendants ignored many studies and events that did not corroborate the narrative they were pushing. For example, on July 16, 2021, King County Public Health staff were notified of a staff party wherein fully vaccinated individuals tested positive for COVID-19 after the staff party. Exhibit BG.

315. Shortly thereafter, Jeffrey Duchin, Chief Communicable Disease Epidemiology and Immunization Section, Public Health for Seattle and King County, and Professor of Medicine, Division of Infectious Diseases, University of Washington, and a member of the CDC Advisory Committee on Immunization Practice (ACIP), admitted that 37% of new cases of COVID-19 were in vaccinated individuals. Exhibit BH.

316. Dr. Duchin also acknowledged awareness of the well-publicized COVID-19 outbreak in Provincetown, Massachusetts, after a Fourth of July celebration, where according to Steve Katsurinis, chair of the Provincetown Board of Health, 469 cases reported among Massachusetts residents alone, **74 percent were in people who were fully immunized.** That number grew to 765 cases overall. Exhibit BI.

317. Dr. Duchin was also aware of the famous Israeli study published in early 2021 and quoted by the CDC that acknowledged the failure of the vaccines in Israel in the first two months of 2021, ten months before Defendants terminated Plaintiffs. Exhibit BJ.

318. Dr. Duchin commented on the Israeli study in a social media post, stating on August 27, 2021, "We hear/read a lot about 'breakthrough' infections & the % of people getting hospitalized or dying with CoV-19 that are vaccinated. But this tells us nothing about what is most important: how the risk changes for vaccinated people compared to unvaccinated people." *Id.*

319. Dr. Duchin then states on September 3, 2021, "Israeli officials say their data shows that the potency of Pfizer's vaccine wanes over time against severe disease & hospitalization…The FDA wants to see the underlying data, to make sure it backs up summaries that the Israeli government has provided." *Id.*

320. To the extent Dr. Duchin was requesting data to back up a published study, it is clear, at minimum, that there were legitimate questions regarding the vaccine, its efficacy, and its safety, requiring a pause in demanding strict vaccination purportedly to control the virus.[23]

321. Dr. Duchin, like Defendants, had a duty to not only understand the science available, but to seek out data that might conflict with the narrative.

322. Indeed, just prior to terminating Plaintiffs, the CDC released a report on or about September 10, 2021, regarding a Norwegian Encore cruise ship returning to port in Seattle because of a large outbreak of COVID-19 with approximately 118 cases, despite

---

[23] Defendants cannot claim they relied on CDC data when they most apparently extracted only that data which supported their discriminatory practice and not the plethora of scientific published and peer-reviewed studies demonstrating that the vaccine was not, as initially proclaimed but clearly disputed at the time of Plaintiffs' terminations, "safe and effective." "Taking judicial notice of publicly available information provided by a government agency" *United States v. Sanft,* No. CR 19-00258 RAJ, 2021 WL 5283957, at *1 (W.D. Wash. Nov. 12, 2021) applies only to the extent that a full, transparent, and comprehensive analysis of that "publicly available information" takes place.

COMPLAINT            81            **ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

its 100% vaccinated traveler status of both passengers and crew, as well as negative test prior to boarding. Health officials recognized, "This is crazy. 118 cases. All vaccinated and ALL tested negative prior to embarkation." Exhibit BK.

323. Dr. Duchin was also made aware that deaths were uncommon overall and the number of deaths among cases is low, combined with the high likelihood that many fully vaccinated individuals were not seeking testing due to mild or asymptomatic illness, therefore increasing the proportions of the most severe outcomes. Exhibit BL. As a leader in infectious disease at the state's largest and primary state medical research facility and hospital, Defendants knew or should have known the science these medical leads were publishing.

324. Defendants claim to have relied on data and studies from the CDC, DOH, King County Health Department, and studies from the University of Washington, all of whom were publishing studies regarding the failure of the vaccine to prevent infection and transmission *prior to* Defendants terminating the Plaintiffs.

325. At minimum, Defendants suffered from confirmation bias in ignoring any data that did not support their narrative.

326. One of those studies ignored by Defendants included a study in September 2021, co-authored by both Dr. Sayre, and Dr. Thomas Rea, medical director for King County Medic One, two prominent health care advisors in the state of Washington, indicating that even among first responders, "we observed **a very low overall risk** for COVID-19 infection among the EMS first responder workforce attributed to COVID-19 patient encounters…" Exhibit BM (emphasis added). By extension, Plaintiffs here posed even a

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

lesser threat in that they did not provide intimate life-saving procedures on a vulnerable population.

327.    Even Snohomish County recognized the failure of the vaccine to contain the spread of the virus, stating on July 30, 2021, "The stellar individual protection afforded by vaccination is no longer, nor is the dream of getting out from under COVID on July 1…the vaccine effectiveness is clearly no longer what it was just a couple of months ago and folks should manage themselves accordingly." Exhibit BN.

328.    This calls into question Defendants' narrative that vaccination was the only means available to prevent death, transmission, or contraction of the virus.

329.    And it emphasizes the discriminatory intent of their actions in terminating religious objectors en masse without even discussing this issue or considering any accommodations.

330.    The data also calls into question Defendants' disparate treatment of religious objectors compared with secular employees.

331.    This treats different classes of individuals differently on the basis of criteria wholly unrelated to the object of the regulation. *See Elsenstadt v. Baird,* 405 U.S. 438, 92 S. Ct. 1029 (1972).

332.    "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560 (1920).

333.    Medical and religious objectors presented the same threat unvaccinated, but medical objectors were admittedly accommodated by Defendants, while religious objectors were specifically not accommodated.[24]

334.    Instead of mandating the taking of a vaccine that was failing, "rates and relative risk provide a clearer picture," Exhibit BL, of virus containment, which Defendants did not consider in its blanket policy that all religious objectors must be vaccinated.

335.    The Defendants knew or should have known that their basis for terminating each of the Plaintiffs – that the Plaintiffs allegedly posed a danger in their unvaccinated state – was a faulty premise given specific knowledge of breakthrough cases and specific knowledge of low mortality among less vulnerable populations and higher rates of mortality among the vaccinated.

336.    The failure of the vaccine negates the narrative that vaccination was needed to prevent deaths.

337.    Defendants' failure to study all data, studies, and events produced a biased narrative that eliminated balancing the risk of infection from being unvaccinated with any hardship suffered through accommodation.

**E.    Plaintiffs were ridiculed and shamed for their beliefs:**

338.    Plaintiffs brought these studies to the attention of Defendants but were ridiculed and chastised for not following the protocol.

---

[24] The arbitrary nature of Defendants' policy in terminating without accommodation consideration is contrary to the position taken at a majority of agencies and other businesses across the state. A majority of hospitals and clinics across the state accommodated even health care workers, who have intimate physical contact with vulnerable populations. Exhibit BO. Additionally, a majority of Fire Departments across the state likewise accommodated their firefighters/paramedics, also employees with close physical contact. Exhibit BP.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

339. Defendants hid behind their conclusory statements, utilizing shame and disparagement to shut down anyone who presented contrary studies or called into question the legitimacy of Defendants' claims.

340. This culture of animosity came from leadership, who directly fueled the animosity and hatred towards religious objectors who asserted their religious freedoms by declining to vaccinate.

341. The pressure to get vaccinated to alleviate the fears of secular vaccinated employees was pervasive in workplace posters and emails.

342. Each Plaintiff has multiple stories of coercion to take the shot, harassment for not taking the shot, and/or disparaging comments regarding Plaintiffs' personal decisions to assert their religious freedoms.

343. Many of these conversations came from leadership within DCYF and supervisory staff.

344. For example, during a FTDM meeting, after it was announced that Plaintiff Kristin Rowland would be leaving the agency due to the vaccine mandate, attorney Karen Unger publicly shamed Ms. Rowland in the meeting by openly stating that no unvaccinated social worker should be around children in the field.

345. When Plaintiff Yvette Hessler returned to retrieve her personal items after her termination, several co-workers expressed shock to learn that Ms. Hessler had a medical reason for being unable to take the shot, as they had been led to believe through omission of information by leadership that she had "refused" the shot.

346. Each Plaintiff also has stories of continued harassment by supervisors to take the vaccine, even after it was made clear that the Plaintiff had sincerely held religious beliefs that

absolutely forbid it. It was clear that Plaintiffs' beliefs were disrespected and given no consideration as to their constitutional right to hold these beliefs. Many Plaintiffs were contacted by Defendants and their agents for the purpose of placing tremendous pressure on Plaintiffs to change their minds about vaccination, clearly not understanding the seriousness of Plaintiffs' beliefs and the laws that protected holding those beliefs.

347. For example, Lori Kesl, Regional Administrator, threatened Plaintiff Doughtery with reassignment to a community facility when Ms. Doughtery initially refused the vaccine prior to the mandate even being issued. This was implied as a punitive measure toward Ms. Doughtery.

348. Plaintiff Bogue experienced ongoing and severe harassment from both her supervisor, Virginia Ford-Faulkner, and Ms. Ford-Faulkner's supervisor. Both employees of Defendants harassed and disparaged Ms. Bogue with constant questions regarding her work in an attempt to claim she could not continue to perform the work remotely as a pretext for termination, denied her the ability to attend unit meetings via zoom, denied ability to attend a meeting at a restaurant despite the fact the restaurant did not have a vaccine mandate, and told Ms. Bogue she could not have any contact with any employees during work hours, which was not the policy.

349. Ms. Ford-Faulkner openly belittled Ms. Bogue at regional adoption unit meetings with her peers and social workers present. At one meeting, Ms. Ford-Faulkner implied Ms. Bogue was a man because her name is unisex.

350. Plaintiff Lacey presented studies of the benefits of natural immunity to Defendants prior to termination, as well as his own positive antibody lab result, but he was dismissed.

351.  Plaintiff Taylor Schrodt was told by Ruby Padilla, supervisor, that "Either you get the shot or you get fired," without any discussion of the interactive dialogue that must take place in that scenario.

**F.**    **Defendants' actions have been fully rejected in multiple arbitrations.**

352.  Numerous agency arbitrations deciding this same issue have unequivocally held for the employees in finding employers violated WLAD and Title VII.

353.  These arbitrations ordered reinstatement and backpay, loss of seniority and benefits, to the wrongfully terminated employees.

354.  In the Michelle Edwards's Arbitration Decision and Award, FMCS Case No. 220323-04584, Exhibit AF, Arbiter Stephan Douglas Bonney, stated, "Although the Employer's determination of direct threat and reasonable accommodations must be evaluated based on the medical knowledge available in the fall of 2021 and not based on current understandings of the virus, the DOC failed to comply with the requirements of ADA. Specifically, it failed to make an individualized assessment of the threat posed by the grievant's performance of her job and it failed to engage in the required interactive process in determining the possible reasonable accommodations of the grievant's disability (unable to be vaccinated due to a medical condition)." Exhibit AF at 9.

355.  "I find, similarly to Arbitrator Cavanaugh, that the employer [Department of Corrections] improperly applied a *per se* rule when it concluded unvaccinated employees would pose a threat in the workplace and when it decided that reassignment was the only possible reasonable accommodation for unvaccinated employees." *Id.* at 10, referencing Exhibit AO (Arbitration of John Hone, PERC Case No. 134845-P-22 (December 19, 2022)).

356. In an arbitration on behalf of LaRetta Martin, DOR, Case No. Arbiter's X59, a terminated employee suggested numerous accommodations to site visits, including allowing a co-worker to perform that part of her job, which DOR refused, claiming it was an essential function of her job. The arbiter found "that claim is problematic: (1) the Department apparently functioned well without [site visits] for an extended period of time; (2) the position description signed by [employee], her supervisor and her appointing authority…mentions such travel but does not show it as essential; and…site visits do not seem to satisfy any of OFM's trigger characteristics for essential job functions…or to meet the simple test that 'An essential function is a completed task, not how that task is completed.'" Exhibit BQ, at 9 n.3. Defendants here did not conduct any essential function analysis of each Plaintiff's job and responsibilities.

357. The DOR Arbitrator also discounted the "'customer service' value of site visits," recognizing that "the customer was accomplished by phone and Zoom for some years during the acute COVID program and nothing in the record supports the suggestion that those methods are no longer satisfactory just because in person contact is now possible." *Id.* at n.4.

358. "DOR seems to have given no serious consideration to that proposal [to allow a co-worker to perform site visits]." *Id.* at 9. Numerous Plaintiffs had the option of co-workers performing minor functions of their job duties, which Defendants rejected.

359. Additionally, DOR apparently never considered whether that shifted burden could be alleviated by shifting some of that other employee's work to [the religious exempt employee] in return for the inspection work." *Id.* at 10 (citing Wash. Admin. Code § 162-

22-065(2)), stating, "Possible examples of reasonable accommodation may include, but are not limited to: (a) Adjustments in job duties,…or scope of work…" *Id.,* at 9 n.6. This likewise was an option denied to Plaintiffs in this case.

360. The arbitrator stated: "But one of the common methods of accommodation is a change in rules, policy, or procedures and such an option seems to have at least deserved consideration in this case…DOR's offhand rejection of [employee's] suggestion to redistribute her site visits duties fell short of DOR's responsibility to accommodate her sincerely held religious belief.…It was the Department's responsibility to seriously consider that proposal, and its immediate dismissal did not satisfy that responsibility. Moreover, on this record, more likely than not, if the Department had considered it, the workloads could be balanced, miss Martin's suggestion was in fact a reasonable accommodation." *Id.* at 11.

361. The arbitrator also addressed the fact that the employee did not violate any rule, yet was still terminated without just cause, but "[b]ecause the just cause issue is moot in the case at hand I decline to address such a fundamental issue on the basis of such a limited record." *Id.* at 12. "But in the case at hand, DOR does not allege that [the employee] violated any rule or fell short of any policy. This case springs from the Governor's vaccination mandate; and that mandate does not say, 'Be vaccinated or we will let you go.' What it says is 'Be vaccinated unless you fall under a medical or religious exception or we will let you go.' There is no dispute that [the employee] did not violate that rule."

89 **ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

362. With respect to DOR: "But one of the common methods of accommodation is a change in rules, policy or procedures, and such an option seems to have at least deserved consideration in this case." Exhibit BQ, at 11.

363. Defendants terminated Plaintiffs for failure to comply with a mandate as Defendants themselves failed to comply with the mandate.

364. And, in fact, Plaintiffs committed no wrongdoing and did nothing warranting "discipline," as Defendants allege, because Plaintiffs did not violate the mandate. The mandate permitted applying for exemptions, which Plaintiffs did in full compliance, eliminating just cause for terminating Plaintiffs. "Just cause is a way of addressing disciplinary acts; and discipline arises when an employer alleges that there was a rule or policy which the [employee] violated or failed to satisfy.... But in the case at hand, [agency] does not allege that [employee] violated any rule or fell short of any policy. This case springs from Governor's vaccination mandate; and that mandate does not say, 'Be vaccinated or we will let you go.' What it says is, 'Be vaccinated unless you fall under a medical or religious exception or we will let you go.' There is no dispute that [employee] did not violate that rule." Exhibit BQ.

365. Plaintiffs as public servants under various collective bargaining agreements could only be terminated "for cause," and they broke no rule in applying for a religious and/or medical exemption to the vaccine as was required by the Proclamation. Defendants fabricated "cause" to justify termination by claiming Plaintiffs broke a rule, but then failed to identify the rule Plaintiffs allegedly broke to justify cause termination.

366. After fabricating a reason for cause termination, Defendants then denied any accommodation to keep Plaintiffs in their jobs.

367. Defendants "did not consider if an accommodation would be an undue hardship to the Agency. Rather than taking an individualized approach of accommodation to an employee, it initiated a global process, which in and of itself, is a prima facie violation of the accommodation process." Exhibit BR at 23 (internal citations omitted).

368. Moreover, there is no indication that Defendants considered the public interest in enforcement of civil rights statutes. *Keene v. City,* May 15, 2023, U.S. App. LEXIS 11807 at 3.

369. Previous arbitrators disagreed with Defendants' reliance on purely speculative harm regarding Plaintiffs' *potential* public interaction threat.

370. "An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information." Exhibit BS. Indeed, Defendants must demonstrate a "*valid* safety concern," *Bhatia,* 734 F.2d at 1384 (emphasis added), but by unilaterally determining there was public exposure and then refusing to discuss any accommodation whatsoever, Defendants failed to perform the analysis required to determine if an accommodation would hinder any safety concern or pose a hardship.

371. "The Agency did not consider the 18 months in determining if an accommodation was reasonable. It did not consider if the [employee] was performing her work in an efficient and professional manner, to determine if an accommodation could be made in terms of either a 'sustainable' or 'optimal' environment." Exhibit BR, at 27.

91    **ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

372. "A reasonable accommodation does not require the employee to fit into an optimal situation. It requires the Agency to determine 'can we still do our main duties.?' It does not require the optimal." *Id.*

373. "Both the CDC and the EEOC have stated that it is a reasonable accommodation to require masking for the unvaccinated." *Id.* at 28. "The EEOC Guidelines in October 2021 clearly state that masking and social distancing was a reasonable accommodation for employees who have been granted a religious exemption and who must be around other employees." *Id.* at 29. Defendants "ignored the importance of the EEOC guidelines regarding masks, social distancing, or other possible accommodations such as testing." *Id.* at 42. In doing so, Defendants "violated the Proclamations and Title VII by failing to reasonably accommodate" Plaintiffs. *Id.*

374. Defendants either ignored Plaintiffs' requests to mask, test, and social distance, or acknowledged the request but denied any discussion of it.

375. In all three WDFW arbitrations by three different arbitrators, it was found that WDFW failed to find a reasonable accommodation before asserting an undue hardship, had conclusions unsupported by evidence to establish an undue hardship and/or violated the Proclamation and Title VII.

376. In the Ruthanna Shirley Arbitrator's Decision and Award, PERC No. 134851-P-22, Exhibit BR, the Arbitrator Michael Anthony Marr found that, "[t]here is nothing in the evidence to indicate that the Agency considered testing or any alternative accommodation to vaccination." *Id.* at 37. Defendants here likewise considered neither.

377. Arbitrator Marr also found that the agency did not consider masks and social distancing as accommodations and that "[f]ailing **to consider** available accommodations is extremely concerning. It is difficult for the Agency to establish good faith when EEOC and/or CDC guidance is ignored and not considered." *Id.* at 36 (emphasis in original).

378. Additionally, the agency "did not take this opportunity to explain with specificity," why masks and social distancing were no longer a reasonable accommodation. *Id.* at 39. "The position taken by the Agency constituted a hypothetical hardship in violation of Title VII because it was conclusory and unsupported by data and other statistical evidence." *Id.* at 40. Defendants here provided no analysis on why Plaintiffs, who had no infections traced to them, could no longer be accommodated with PPE and other protocol used throughout the pandemic.

379. In the John Hone Arbitration Decision and Award, PERC No. 134845-P-22, Exhibit AO, Arbitrator Michael E. Cavanaugh specifically found that the Agency failed to follow the interactive process and that such failure could not be excused. *Id.* at 10.

380. Arbitrator Cavanaugh also rejected the Agency's assertion that, "in effect, no inquiry into an individuals' work situation – beyond evaluating a job description – was necessary." *Id.* at 10-11. Defendants here likewise relied on job descriptions in lieu of dialogue, rejected by Arbitrator Cavanaugh.

381. "The Department failed to afford [Mr. Hone] the individualized consideration of his religious accommodation request that is required by law and by the parties' MOU. In addition, at least as applied to Mr. Hone, the Department's *per se* rule against masking and distancing as part of an appropriate religious accommodation violated the law and

the MOU." *Id.* at 16. Defendants here likewise had a *per se* rule against any accommodations, steadfastly reinforced through repeated statements that no unvaccinated individual will be allowed on site, and unvaccinated were not allowed to work.

382. In the Tyler Kave Arbitration Decision and Award, PERC No. 134848-P-22, Exhibit BT, Arbitrator Barbara J. Diamond found that the Agency did not provide a legal accommodation process before terminating Mr. Kave. *Id.* at 25.

383. In an arbitration decision resulting from a grievance filed by City of Seattle employee Kristine Huffaker, Seattle City Lights Crew Chief, the arbitrator found that the alleged "non disciplinary separation" was disciplinary, as it was an action initiated by the employer, unwelcomed by the employee, concerned a work rule or policy created by the employer, and the employer suffered detriment in the form of lost income, insurance and/or retirement benefits. Exhibit AP at 26. This finding conflicts with "for cause" restrictions when terminating public employees under collective bargaining agreements and state statutory laws governing public employees.

384. Moreover, the arbitrator likewise found that the City failed to conduct a layered approach by considered masking, social distancing, and testing, as accommodations to grievant's religious beliefs. All three, the arbitrator concluded, are required. While there was evidence that the City may have considered masking and social distancing, there is no evidence that they likewise considered testing in conjunction with those former considerations. *Id.* at 33-37.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

385. Additionally, like Plaintiffs in the instant case who were allegedly analyzed for an accommodation utilizing old, outdated, or incorrect job descriptions, the arbitrator in the Huffaker decision likewise found it "clearly unfair to the Grievant," *id.* at 38, where grievant was analyzed under a job title as a line worker, not as her true position as a crew chief. "Any accommodation letter would have to address her position as a crew chief, not as a line worker." *Id.*

386. Defendants followed the same procedures and methodology used by WDFW, DOR, DOC, and City of Seattle in its accommodations process.

387. Defendants' failure to engage in an accommodation process that seriously considered each Plaintiff's specific work environment is a fatal flaw, as these arbitrations concluded.

**G.    Defendants failed to consider the net burden to the agency caused by mass terminations:**

388. In their refusal to consider accommodations for Plaintiffs, Defendants failed to balance the undue hardships to the citizens of Washington State with their decision to deny accommodations.

389. OFM guidance for granting accommodation *required consideration for issues such as "causes a lack of staffing,"* as well as "[s]ize and operating costs of the business impact of the accommodation on the agency as a whole," Exhibit BU.

390. OFM guidance required Defendants to consider "safety concerns and security consideration." *Id.*

391. In June 2023, 47,000 unionized workers across Washington State launched a no-confidence vote against Defendant Hunter, a resolution which passed unanimously and

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

without amendment by the Executive Board of WFSE, urging Governor Inslee to remove Defendant Hunter from his position. Exhibit BV.

392. The basis for this vote of no confidence included the failure of Defendant Hunter to handle the staffing crisis at DCYF, *id.,* which was caused and/or exacerbated by the mass terminations facilitated by Defendant Hunter's refusal to follow the law and accommodate Plaintiffs.

393. In addition to staffing issues Defendant Hunter created, the Resolution also addressed severe safety concerns that permeated the agency in the aftermath of terminations.

394. DCYF issued instructions regarding the Governor's "'Continuity of Operations Plan (COOP)' and the essential job functions that must continue." Specifically, COOP "is an effort made within agencies to ensure that their Primary Mission Essential Functions (PFEF) continue to be performed during a wide range of emergencies." Exhibit BW. The job descriptions of many of the Plaintiffs identified in the section titled "COOP Designation – For Disaster or Emergency Recovery" stated that Plaintiff was filling a "position critical based on agency COOP." Exhibit BX at 4. Defendants did not consider the crucial role these Plaintiffs played in the mission of the agency, causing Defendants' clients and the citizens of this state to suffer the impact of Defendants' discriminatory acts.

395. Numerous Plaintiffs were, at the time of termination, filling "position[s] critical based on agency COOP," *id.,* including, but not limited to Plaintiffs Seagraves, Lupo, Hessler, and Mooers. In fact, Ms. Hessler's updated job description which they made her sign before she was terminated, stated she was filling a critical position based on agency COOP.

396. Employees who were *not* designated "high risk" were required to perform job duties for those who were given full time or part time telework due to alleged "high risk" status, regardless of the essential functions of the job filled by the high-risk employee. This was a consideration specifically denied to religious objectors.

397. Defendants refused to recall terminated religious objectors back to work and continued to discriminate against them, despite the severe impact on the agency mission.

398. In fact, Plaintiff Charlene Ramirez applied for an on-call position approximately one year after termination and received no response.

399. Plaintiff Kristin Rowland applied for four accommodation positions and was denied all of them on November 1, 2021. Ms. Rowland also applied for two positions in July 2023 after the mandate was lifted, including her previous position, but was denied that position with DCYF choosing someone within the Agency who was not a religious objector.

400. Based on information and belief, DCYF terminated religious objectors without allowing telework accommodation, but then hired out of state and unvaccinated remote workers to fill positions that Plaintiffs could have filled.

## V. CAUSES OF ACTION AGAINST DEFENDANTS

### FIRST CAUSE OF ACTION
### (Violation of the First Amendment of the United States Constitution – Free Exercise)

401. Plaintiffs here reallege the allegations set forth above in this Complaint.

402. The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." This

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

clause has been incorporated against the states. *Cantwell v. Connecticut,* 310 U.S. 296 (1940).

403. Government decisionmakers violate the Free Exercise Clause of the First Amendment, as incorporated against states via the Fourteenth Amendment, when they express or harbor animus towards religion and when that animus accompanies an official action that burdens religious exercise.

404. There is no immunity for violating this clearly established fundamental constitutional right.

405. The unanimous Supreme Court has held that '[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1877 (2021).

406. Courts should not inquire into the validity or plausibility of a person's beliefs; instead the task is to determine whether "the beliefs professed []are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger,* 380 U.S. 163, 185 (1965).

407. Plaintiffs' sincerely held religious beliefs that prohibit them from taking the COVID-19 vaccinations have been unconstitutionally burdened by Defendants. Plaintiffs' accommodations were universally denied.

408. Defendants also violated the Free Exercise Clause of the First Amendment, as incorporated against the states via the Fourteenth Amendment, when they openly mocked and condemned Plaintiffs because of their religious beliefs or tacitly approved of or shared their colleagues' animus towards Plaintiffs' religious beliefs.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

409. These acts were done in the Defendants' personal capacities outside the scope of their official duties. There is no immunity for violating this clearly established fundamental constitutional right to be free from religious discrimination.

410. Defendants have pitted Plaintiffs' consciences against their ability to work. The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin,* 142 S. Ct. 1987 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.,* 485 U.S. 439, 450 (1988)). "In particular, we have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*

411. Defendants openly stated that religious accommodations would be denied, but secular (*i.e.*, medical) accommodations were allowed. Here, regarding regulating the conduct of its secular and religious citizens, the government holds the same interest in preventing disease. Further, the secular and religious activities at issue are not only comparable, but they are also the same, seeking exemption from compulsory vaccination.

412. A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. While defendants may have a general healthcare interest in preventing the spread of disease, its interest is not so extraordinary as to prohibit an accommodation for religious reasons, which poses a similar contagion hazard as a hypothetical medical accommodation.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

413. Government regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsome,* 141 S. Ct. 1294, 1296 (2021).

414. Defendants have instituted a system that includes 2 levels of personalized discretionary review. The Defendants have delegated private healthcare providers discretion to determine what broad variety of circumstances are eligible for a medical exemption, and which are not. Acting on behalf of the state, these physicians conduct an individualized assessment of each potential medical exemption. If and when the medical exemption form is signed by a physician, it is then submitted to Defendants to enter yet another discretionary process of affording an accommodation.

415. Defendants' vaccination policy thus fails the general applicability test on additional, alternative grounds because the medical exemption system provides for individualized discretionary review. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable...." *Fulton,* 141 S. Ct. at 1879. A government policy or practice "is not neutral and generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton,* 141 S. Ct. 1877.

416. Defendants also operated with full discretion to treat religious accommodations differently and adverse to accommodations provided to secular objectors. *See Tandon v. Newsom,* 141 S. Ct. 1294, 1296 (2021) (regulations "trigger strict scrutiny under the Free

Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise"); *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407, 2422 (2022).

417. Defendants have created categorical exemptions and individualized exemptions from their policies and procedures that accommodate non-religious objections.

418. But religious objectors were told to either eliminate all risk, or lose their jobs, whereas secular employees were allowed to reinfect, retransmit, and create risk, not requiring a booster which was available and which would have theoretically reduced risk, giving them an advantage over religious employees.

419. Religious objectors, who "can't get preliminary injunctive relief, you'll have no choice but to sacrifice your faith, in order to avoid sacrificing your family....What measure of damages would make you whole? Put another way: For how much would you sell your soul?" *Sambrano, et al. v. United Airlines, Inc.,* 45 F.4th 877 (petition for rehearing en banc denied) (5th Cir. 2022) (J. Ho, concurring).

420. Plaintiffs have sincerely held religious beliefs that conflict with the taking of the vaccines. Their compliance with these beliefs is a religious exercise.

421. Under *Fulton* and *Tandon,* Defendants' willingness to accommodate for secular reasons and to treat secular employees more favorably than religious objectors is an adverse employee action against religious objectors and triggers strict scrutiny.

422. Defendants' discriminatory treatment and selective accommodation practices create government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

423. Defendants' discriminatory treatment chills Plaintiffs' religious exercise.

101

424. Defendants' discriminatory treatment has exposed Plaintiffs to substantial consequences for their religious exercise, including but not limited to the loss of their jobs, the disruption of their careers, lost wages and benefits, and loss of reputation.

425. Because of their religious beliefs, Defendants denied Plaintiffs an accommodation that they afforded to comparable non-religious expression and conduct.

426. Defendants have no compelling interest in violating Plaintiffs' religious exercise. Even if there was a compelling government interest, Defendants have not shown that their actions are the least restrictive means of achieving that interest.

427. All the acts of Defendants were conducted by them under color and pretense of the statutes, regulations, customs, policies, and/or usages of the State of Washington and the DCYF.

428. Defendants knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

429. Defendants acted with willful malice, and/or intentionally and in gross disregard of Plaintiffs' constitutional rights, and/or in reckless disregard of Plaintiffs' constitutional rights.

430. There is a *per se* divestiture of sovereign immunity for constitutional violations, and such unconstitutional acts are by definition outside the scope of a government agent's official capacity, *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1332-33 n.3 (9th Cir. 1987), triggering personal liability.

431. As a direct and proximate result of Defendants' actions, Plaintiffs have been deprived of their constitutional rights to the free exercise of religion and to be free from governmental

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

hostility directed at their religion and have been denied their rights to due process and equal protection under the law.

432. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

## SECOND CAUSE OF ACTION
### (Deprivation of Religious Freedom, WA Const. Art. I, Sec. 11.)

433. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

434. Defendants' vaccination mandate and religious exemption questionnaire are contrary to and transgress Wash. Const. art. I, § 11, which states, "Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion…No religious qualification shall be required for any public office or employment."

435. Plaintiffs' absolute right to religious freedom has been infringed.

436. Defendants, by their conduct and words, discriminated against the Plaintiffs for acting according to their conscience, guided by their religious faith, in refusing to be vaccinated.

437. Defendants' vaccination mandate, in conjunction with their religious exemption questionnaire, by design and intent, impose a religious qualification for public employment, and deny Plaintiffs' absolute freedom of conscience in all matters of religious sentiment, belief and worship, and result in an unauthorized molestation or disturbance of the Plaintiffs' persons and property rights on account of religion.

438. These acts were performed by Defendants in their individual capacities in furtherance of their religious animus towards each Plaintiff.

439. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**(Deprivation of Life, Liberty, or Property; U.S. Const. Am. V., Am. XIV, WA Const. Art. I, Sec. 3)**

440. Plaintiffs here reallege the allegations set forth in this Complaint as if fully set forth herein.

441. No person shall be deprived of life, liberty, or property, without due process of law. U.S. Const. Ams. V, XIV; Wash. Const. art. I, § 3.

442. The "liberty" specially protected by the Due Process Clause includes the right to bodily integrity, *Rochin v. California,* 342 U.S. 165, 72 S. Ct. 205 (1952).

443. The Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.

444. The application of the vaccine mandate by Defendants violates the liberty protected by the Fourteenth Amendment to the Constitution, which includes the rights of personal autonomy, self-determination, bodily integrity, and the right to reject medical treatment.

445. There is no immunity for violating this clearly established fundamental constitutional right.

446. As the vaccines did not prevent infection or transmission, they are considered medical treatment and cannot be mandated. *See Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997) (citing *Cruzan v. Director, Mo. Dep't of Health,* 497, U.S.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

261, 278-79, 110 S. Ct. 2841, 2851-2852 (1990)). The CDC even changed its own definitions of "Vaccine" and "Vaccination" to eliminate the word "immunity."

447.  The ability to decide whether to accept or refuse medical treatment is a fundamental right, demanding strict scrutiny. "Rational basis review is the test this Court *normally* applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of a fundamental right….Here, that means strict scrutiny." *Roman Catholic Diocese,* 141 S. Ct. at 67 (Gorsuch, J., concurring) (emphasis in original).

448.  Accordingly, Defendants' application of the mandate to Plaintiffs violates Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

449.  Because the COVID vaccines are not vaccines but medical treatments, strict scrutiny applies. The U.S. Supreme Court has recognized a "general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 278, 110 S. Ct. 2841 (1990). It is also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper,* 494 U.S. 210, 229, 110 S. Ct. 1028, 1041 (1990), *see also id.* at 223 (further acknowledging in dicta that, outside of the prison context, the right to refuse treatment would be a "fundamental right" subject to strict scrutiny).

450.  As mandated medical treatments are a substantial burden, Defendants must prove that they narrowly tailored their interest to meet a compelling interest.

451.  No compelling interest existed at the time of termination as the COVID vaccines were not effective against the spread and transmission of the virus, and the evidence showed

that vaccinated individuals have more COVID-19 virus in their nasal passages than unvaccinated people.

452. Moreover, the blanket application of demanding vaccination ignored individual factors increasing or decreasing the risk that each Plaintiff posed to themselves or to others.

453. Defendants disregarded whether Plaintiffs had already obtained natural immunity despite the fact that natural immunity does actually provide immunity whereas the COVID vaccines do not.

454. Treating all employees the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

455. Defendants also conducted sham hearings that were predetermined and meaningless.

456. Due process requires that, prior to termination, an employee be given the chance to tell [his] side of the story, and that the agency be willing to listen." *Ryan v. Illinois Dep't of Children & Family Serv.,* 185 F.3d 751, 762 (7th Cir. 1999) (reversing summary judgment for defendant on due process claim by discharged employee); and *see*, *e.g.*, *Powers v. Richards, et al.*, 549 F3d 505, 512-13 (7th Cir. 2008) ("A hearing where the decisionmaker has prejudged the outcome does not comport with due process).

457. A sham hearing is "totally devoid of meaningful opportunity to be heard," *Washington v. Kirksey,* 811 F.2d 561, 564 (11th Cir. 1987); *Wagner v. City of Memphis,* 971 F. Supp. 308, 318–19 (W.D. Tenn. 1997); *Constantino v. S. Humboldt Unified Sch. Dist.*, 18-CV-02249-RMI, 2019 WL 201565, at *8 (N.D. Cal. Jan. 15, 2019).

458. Plaintiffs suffered loss of pension rights and benefits as a direct result of the actions of Defendants. Public employees have a property interest in their employment, cannot be

terminated without "just cause," and cannot be terminated without due process, which includes a fair hearing. *Board of Regents v. Roth*, 408 U.S. at 564 (1972); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 (1985).

459.    Public employees have a property interest in their pensions, which cannot be unilaterally altered to the material disadvantage of the employee. *Eagan v. Spellman,* 90 Wash.2d 248 (1978).

460.    Moreover, collective bargaining agreements create a protected property interest for which employees are entitled to due process. *Cheli v. Taylorville Community School District,* 986 F.3d 1035, 1040 (7th Cir. 2021) (holding that even an "at-will employee could not be terminated without due process because his employment was controlled by a CBA which provided that "[a]n employee may be disciplined, suspended, and/or discharged for reasonable cause," and that reasonable cause was a mandatory prerequisite to any termination).

461.    Defendants caused or personally participated in causing the deprivation of Plaintiffs' constitutional rights. *Arnold v. IBM,* 637 F.2d 1350, 1355 (9th Cir. 1981).

462.    Defendants each committed affirmative acts, failed to perform an act that he or she is legally required to do, and which caused the Plaintiffs' deprivation. *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978).

463.    These acts were committed in both Defendant Hunter's personal and official capacity, outside the scope of his authority.

464.    There is a *per se* divestiture of sovereign immunity for constitutional violations, and such unconstitutional acts are outside the scope of a government agent's official capacity,

*Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1332-33 n.3 (9th Cir. 1987), triggering personal liability.

465. Defendants each had personal participation in the acts described and were the proximate cause of Plaintiffs' damages.

466. Plaintiffs lost title to their real property due to Defendants' actions, had to relocate at considerable loss in the sale of that property, which are losses they cannot recover.

467. "While a return to normalcy is desired, the cost of the return should never jeopardize religious liberty. As Justice Gorsuch recently explained, 'Even if the Constitution has taken a holiday during the pandemic, it cannot become a sabbatical.' *Roman Cath. Diocese of Brooklyn v. Cuomo* 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). In this Court's opinion, assuming the Constitution has taken a holiday, this holiday is long over, and it needs to get back to work, NOW." *Hunter Doster, et al. v Hon. Frank Kendall,* 1:22-cv-00084_MWM, Doc #47 at 2 (S.D. Ohio, Mar. 3, 2022).

468. Defendants knew the Fourteenth Amendment prohibits government from denying an employee due process.

469. Defendant Hunter, acting in his personal capacity, could not reasonably believe that providing no interactive dialogue or individualized discussion with each of the Plaintiffs complied with federal and state law.

470. Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their substantive and procedural due process rights as described in the above facts, thereby causing Plaintiffs damages in amounts to be proven at trial.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Ave NE, Suite 200
Redmond, WA 98052
(206) 799-4221

**FOURTH CAUSE OF ACTION**
**(Violation of the Equal Protection Clause of the WA Const. Art. I, Sec. 3, U.S. Const. XIV Amendment)**

471. Plaintiffs here reallege the allegations set forth in this Complaint as if fully set forth herein.

472. Wash. Const. art. I, § 3, states that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

473. The Fourteenth Amendment to the U.S. Constitution likewise prohibits classifications that affect some groups of citizens differently than others. *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 601 (2008).

474. The Equal Protection Clause prohibits discrimination on the basis of religion.

475. Under the Equal Protection Clause, government officials may not treat someone differently as compared to similarly situated persons, when such disparate treatment burdens the exercise of a fundamental right such as the First Amendment's free exercise of religion and freedom of speech.

476. There is no immunity for violating this clearly established fundamental constitutional right.

477. Defendants violated the Equal Protection Clause by refusing to accommodate Plaintiffs' religious beliefs while providing numerous accommodations for other employees' non-religious preferences. Defendants' policies and practices of accommodating non-religious preferences while denying religious accommodations to Plaintiffs were the moving force behind Defendants' violation of Plaintiffs' rights to enjoy equal protection of the laws.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

478. By treating Plaintiffs differently on the basis of a suspect classification, religion, and by violating her fundamental rights, the Defendants' actions trigger strict scrutiny.

479. There was no rational relation to some legitimate government end because the action taken – termination of the unvaccinated – did not further the interest of reducing the spread of COVID-19 given that the vaccinated and the unvaccinated both contract and transmit COVID-19.

480. In fact, people who are vaccinated for COVID-19 are more likely to become infected with and spread COVID-19 than are people who have recovered from COVID-19 and have natural immunity.

481. Defendants have treated different classes of people unequally, with the protected class of religious objectors not coincidentally being adversely impacted by the actions of Defendants, requiring strict scrutiny analysis.

482. Defendants created two classes of employees: vaccinated and unvaccinated, yet the situations of these classes are indistinguishable because both vaccinated and unvaccinated can become infected and reinfected with COVID-19 and can transmit COVID-19 to the public. The vaccines make no difference in these respects.

483. Defendants also created two classes of vaccine objectors: those who had a sincerely held religious belief and those who had a secular basis for refusing the vaccination, yet those with a secular basis for refusing the vaccination were treated more favorably than those who had a religious basis.

484. The actions of Defendants, on its face and as applied, was not rationally related to a legitimate end.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

485. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

486. The actions of Defendant described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their equal protection rights as described in the above facts, thereby causing them damages described *infra.*

**FIFTH CAUSE OF ACTION**
**(Violation of the "Takings Clause"**
**U.S. Const. Amend. V; Wash. Const. Art. 1, Sec. 16)**

487. The Plaintiffs here reallege the allegations set forth above in this Complaint.

488. Both the United States and the Washington Constitutions prohibit the taking of private property for public use without just compensation. U.S. Const. amend. V; Wash. Const. art. I, § 16; *see Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 536-37 (2005) (characterizing the takings clause as placing a *condition* on the exercise of the power to take private property).

489. Plaintiffs each were deprived of wages, pension rights, and other contractual benefits of employment by the wrongful actions of Defendants.

490. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

491. "A regulation that is otherwise a valid exercise of police power may go 'too far' in its impact on a property owner as to constitute a taking, requiring compensation." *Instacart v. City of Seattle,* No. 99771-3, slip. op. at 27-28 (Wash. Sup. Ct. Feb. 9, 2023) (quoting *Chong Yim v. City of Seattle,* 194 Wash.2d 651, 658-59 (2019) (quoting *Pa. Coal Co. v.*

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

*Mahon,* 260 U.S. 393, 415 (1922)), *Chevron,* 544 U.S. at 543 (holding that an inquiry into a regulation's validity is "logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.")

492. Intangible property rights, including valid contracts, are protected by the takings clause. *Id.*

493. Plaintiffs each had an employment contract with the Defendants that constitutes property for the purposes of the takings clause.

494. Each of the Plaintiffs has a claim for damages to redress injuries and damages caused by their termination the taking of their property and are entitled to judgment therefor.

## SIXTH CAUSE OF ACTION
### (Violation of the Washington Law Against Discrimination Failure to Accommodate)

495. Plaintiffs here reallege the allegations set forth above in this Complaint.

496. Each Plaintiff was found by the Defendants to have a sincerely held religious belief preventing vaccination and was granted an exemption, and/or was granted a medical exemption preventing vaccination due to a medical condition.

497. Defendants granted these religious and medical exemptions.

498. Plaintiffs made repeated requests for accommodations but were shut down without discussion.

499. By law, the interactive process is mandatory. *See Martinez v. Costco Wholesale Corp.,* 481 F. Supp. 3d 1076, 1099 (S.D. Cal. 2020).

500. Defendants failed to consider any of the accommodations proposed by Plaintiffs.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

501. Defendants refused to do their jobs, motivated by religious animus, and refused to perform even a basic interactive dialogue with each Plaintiff prior to termination, rendering them liable in both his personal and official capacity.

502. Because WLAD contemplates individual supervisory liability, a supervisor acting in the interest of an employer can be held individually liable for his or her discriminatory acts. *Brown v. Scott Paper Worldwide Co.,* 143 Wash.2d 349, 360, 20 P.3d 921, 927 (2001) (en banc).

503. Supervisors are personally accountable for their acts when they aid another in discrimination, as well as accountable when their own actions are directly discriminatory. *Id.*

504. The policy, practice or custom designed by Defendants was a deliberate indifference to and repeated denial of a basic dialogue owed to each Plaintiff that Defendants refused to provide, in violation of Plaintiffs' constitutional rights.

505. Defendants gave mere lip service to the claim they considered any accommodation other than reassignment, which is not an accommodation, but a last-ditch attempt to keep the employee employed *only after* a legitimate accommodation process has been conducted.

506. Defendants sent letters of termination without discussion, then held sham meetings at the last minute that were totally devoid of meaning.

507. "The hearing must be more than a mere sham: if the plaintiff can prove that the decision makers reached their conclusion prior to the hearing and refused to consider the evidence due process would not be satisfied. A plaintiff who can introduce evidence that the decision has already been made and any hearing would be pro forma and meaningless is

113

entitled to go forward with a due process claim." *Lopez-Anaya v. Palacios-de-Miranda*, No. CIV. 06-2085CCC, 2007 WL 2254501, at *2 (D.P.R. Aug. 6, 2007).

508. The fact that not one hearing facilitated a change in termination status demonstrates the futility of the predetermined hearings.

509. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

510. A sham hearing is "totally devoid of meaningful opportunity to be heard," *Washington v. Kirksey,* 811 F.2d 561, 564 (11th Cir. 1987); *Wagner v. City of Memphis,* 971 F. Supp. 308, 318–19 (W.D. Tenn. 1997); *Constantino v. S. Humboldt Unified Sch. Dist.*, 18-CV-02249-RMI, 2019 WL 201565, at *8 (N.D. Cal. Jan. 15, 2019).

511. A reasonable accommodation requires an employer to take "positive steps" to accommodate employees, *Goodman v. The Boeing Co.,* 127 Wash.2d 401, 408, 899 P.2d 1265 (1995).

512. "We hold that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1116 (9th Cir. 2000), *rev'd on other grounds,* 535 U.S. 391, 122 S. Ct. 1516 (2002).

513. "To demonstrate good faith engagement in the interactive process…employers can point to cooperative behavior which promotes the identification of an appropriate accommodation," and "both parties discover the precise limitations and the types of accommodations which would be most effective; the evaluation of proposed accommodations requires further dialogue and an assessment of the effectiveness of each

accommodation, in terms of enabling the employee to successfully perform the job." *Barnett,* 228 F.3d at 1115.

514. Defendants failed to identify an undue hardship it would have suffered had it accommodated Plaintiff, in accordance with precedent *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), and revisited and reaffirmed in *Groff v. DeJoy*, 600 U.S. 447, 143 S. Ct. 2279 (2023) (holding that *Hardison* requires not just a *de minimis* burden, but employer must show "that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.") *Groff,* 143 S. Ct. at 2281.

515. Defendants stated that reassignment was the only possible accommodation, but then universally denied reassignment to terminated employees.

516. Plaintiffs were forced to either (a) disregard their sincerely held religious beliefs, and/or put their health at risk, or (b) lose their positions, seniority, pensions, professions, and livelihoods. *See Rolovich v. Washington State University,* 2023 WL 3733894 (W.D. Wash. May 30, 2023) (upholding a claim by Plaintiff against WSU for failure to accommodate under WLAD).

517. Plaintiffs were forced to either be terminated or take a vaccine in direct violation of their sincerely held religious beliefs in order to feed their families.

518. Defendants gave no consideration to the public interest in enforcement of civil rights statutes. *Keene v. City,* No. 22-16567 (9th Cir. May 15, 2023), 2023 WL 3451687 (citing *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138-39 (9th Cir. 2009)); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.,* 630 F.3d 1153, 1166-67 (9th Cir. 2011) (concluding that public

interest was served by requiring entities to comply with the American with Disabilities Act).

519.    Strict scrutiny applies where fundamental rights are concerned.

520.    Where the mandated vaccine does not prevent infection or transmission, Defendants' actions, *and the continuance thereof,* are arbitrary and capricious and fail even a rational basis review.

521.    Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Violation of the Washington Law Against Discrimination**
**Disparate Impact)**

522.    Plaintiffs here reallege the allegations set forth above in this Complaint.

523.    To the extent that Defendants' policy is facially neutral, it falls more harshly upon those within a protected class.

524.    The State must treat religious exercises at least as well as comparable secular activities unless it can meet the demands of strict scrutiny—showing it has employed the most narrowly tailored means available to satisfy a compelling state interest. *Church of Lukumi Babalu Aye, Inc. v. Hileah,* 508 US. 520, 546 113 S. Ct. 2217 (1993).

525.    Defendants treated secular employees more favorably than religious objectors by granting accommodations to medical objectors in the same job with the same essential functions as religious objectors who were denied accommodation.

526.    Defendant Hunter's policy of disparate treatment of religious objectors compared to secular employees was a violation of WLAD and the Proclamation he was tasked to

enforce. His actions were conducted outside the scope of his employment without authority and were arbitrary and capricious.

527. Because WLAD contemplates individual supervisory liability, a supervisor acting in the interest of an employer can be held individually liable for his or her discriminatory acts. *Brown v. Scott Paper Worldwide Co.,* 143 Wash.2d 349, 20 P.3d 921 (2001) (en banc).

528. The Plaintiffs have been damaged by the disparate impact of the Defendants' policy.

529. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

530. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

### EIGHTH CAUSE OF ACTION
### (Wrongful Termination – Retaliation in Violation of Wash. Rev. Code § 49.60.210)

531. The Plaintiffs here reallege the allegations set forth above in this Complaint.

532. Plaintiffs engaged in acts protected under Wash. Rev. Code § 49.060.210 when they:

(a) Applied for a reasonable accommodation based on religion and/or medical conflict with the taking of the vaccination.

(b) Reported to the Defendants that it was engaging in discrimination against Plaintiffs in violation of WLAD (Wash. Rev. Code 49.60).

533. Defendants had actual knowledge that each Plaintiff had applied for a reasonable accommodation based on religion and/or medical conflict with the taking of the vaccine.

534. Defendants violated Wash. Rev. Code § 49.60.210 by terminating Plaintiffs because of and in retaliation for the Plaintiffs having engaged in acts authorized or protected by Wash. Rev. Code § 49.60.

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

535. Defendants also violated Wash. Rev. Code § 49.60.210 by refusing to rehire Plaintiffs after the mandate was lifted, because of and in retaliation for Plaintiffs having engaged in acts authorized or protected by Wash. Rev. Code § 49.60.

536. There existed a causal link between the Plaintiffs' protected activity and the adverse employment action resulting in Plaintiffs' termination and the refusal to rehire.

537. Retaliation was a substantial factor motivating the adverse employment decision.

538. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

539. As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered:

a) Lost wages;

b) Future lost wages;

c) Lost benefits of employment;

d) Future lost benefits;

e) Consequential economic damages;

f) Emotional distress and mental anguish;

g) The loss of their employment position.

540. Plaintiffs are entitled to an award of damages against the Defendants as well as appropriate equitable remedies, attorney's fees, and costs of this action, as allowed under applicable Washington State law.

## NINTH CAUSE OF ACTION
### (Violation of Washington Law Against Discrimination Perceived Physical Disability)

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

541. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

542. The Washington Law Against Discrimination (WLAD) prohibits discrimination in the workplace for actual or perceived disability. Wash. Rev. Code § 49.60.180. *Taylor v. Burlington Northern Railroad Holdings,* 193 Wash.2d 611 (2019) (en banc*).* WLAD's definition of disability is broader than the definition in the ADA. *Pulcino v. Fed. Express Corp.,* 141 Wash.2d 629, 641 n.3 (2000).

543. A disability is defined as "a sensory, mental, or physical impairment that …(i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s *perceived* to exist whether or not it exists in fact." Wash. Rev. Code § 49.60.040(7). Disability is also an impairment that "affects one or more of the . . . body systems." Wash. Rev. Code § 49.60.040(7)(c)(i).

544. The legislature intended to adopt a broad and expansive definition of "disability" to protect against discrimination. *Taylor,* 193 Wash.2d at 618.

545. The EEOC has interpreted these rules to include protection for an actual or perceived immunological condition.

546. WLAD's definition of disability is broader than the definition in the ADA. *Pulcino v. Fed. Express Corp.,* 141 Wash.2d 629, 641 n.3 (2000).

547. Defendants perceived Plaintiffs as having an impairment and/or disability that identified them as presenting a "significant risk of harm."

548.  Several Plaintiffs were denied accommodation despite being granted exemptions based on medical issues and were likewise terminated due to perceived physical disability.

549. Defendants acted believing Plaintiffs have a perceived physical disability of not having the best protection against COVID-19 in their bodies or having a recognized medical issue preventing the taking of the vaccine that conflicted with a stated job requirement defined by Defendants' vaccine mandate.

550. Defendants were aware of this conflict but did not explore any available reasonable alternatives for accommodating Plaintiffs to resolve the conflict. *Suarez v. State,* 2022 WL 4351109 (September 20, 2022).

551. Defendants refused to consider or explore accommodations and refused to balance the undue hardships to the citizens of Washington State, the environment, and the mission of the agency.

552. Defendants terminated Plaintiffs due to their perceived physical disability.

553. Defendants' actions caused Plaintiffs to suffer damages to be proven at trial, such actions being the actual and proximate cause of those damages.

### TENTH CAUSE OF ACTION
### (Deprivation of Privacy)

554. Plaintiffs here reallege the allegations set forth in this Complaint as if fully set forth herein.

555. No person shall be disturbed in his private affairs, or his home invaded, without authority of law. Wash. Const. art. I, § 7.

556. In *Reid v. Pierce County*, 136 Wash.2d 195, 961 P.2d 333 (1998), the court held:

(1)    The RESTATEMENT (SECOND) OF TORTS § 652D (1977) provides the general rule for invasion of privacy. It states:

RESTATEMENT (SECOND) OF TORTS § 652H (1977) provides for damages available to one who establishes a cause of action for invasion of

privacy: "One who has established a cause of action for invasion of his privacy is entitled to recover damages for (a) the harm to his interest in privacy resulting from the invasion; (b) his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; and (c) special damage of which the invasion is a legal cause."

    (2)    "In *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 580 P.2d 246 (1978), we indicated that a tort action for invasion of the right of privacy exists in Washington."

    (3)    "the tort right is the most widely recognized and established definition of the legal right of privacy"

    (4)    "So that no further confusion exists, we explicitly hold the common law right of privacy exists in this state and that individuals may bring a cause of action for invasion of that right."

557. This constitutional right to privacy includes the right to autonomous decision-making and autonomy over one's medical care and includes the right to refuse treatment. *See, e.g., In re Welfare of Colyer,* 99 Wash.2d 114, 119-22, 660 P.2d 738 (1983); *see also* Wash. Rev. Code § 7.70.050.

558. Bodily autonomy is a critical component of the constitutional right of privacy.

559. The vaccine did not stop transmission or infection and is therefore a medical treatment. Defendants' application of the mandate to Plaintiffs violates Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

560. The decision to suffer the battery of a vaccination is also a private affair which further impacts a citizen's bodily integrity.

561. As the vaccines did not prevent infection or transmission, they are considered medical care and cannot be mandated. *See Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997) (citing *Cruzan v. Director, Mo. Dep't of Health,* 497 U.S. 261, 278-79, 110 S. Ct. 2841, 2851-2852 (1990)).

562. The Washington State privacy protections under art. I, § 7, are broader than the privacy rights under the U.S. Constitution's Fourth Amendment, as Section 7 guarantees, "an individual's right to privacy *with no express limitations." Robinson v. City of Seattle,* 102 Wash. App. 795 (2000) (emphasis added).

563. Plaintiffs have the right to make the decision whether to receive a COVID-19 vaccine and have the right to decide not to disclose their personal medical history – including whether they have been "fully vaccinated" for COVID-19.

564. Despite these rights, Defendants refused employment to Plaintiffs.

565. Plaintiffs have been deprived of their rights to privacy by the actions of Defendants in forcing Plaintiffs to violate their religious and/or medical freedoms or suffer loss of employment and loss of pension.

566. The right to privacy is protected under Wash. Const. art. I, § 7, as a fundamental right which can only be infringed upon by a law which satisfies a strict scrutiny analysis, that is, which furthers a compelling state interest and is narrowly tailored thereto, using the least restrictive means.

567. Defendants demanded termination of those with a sincerely held religious belief who did not vaccinate, alleged in the interest of stopping the spread of COVID-19.

568. However, the vaccines did not stop infection or transmission, and both the vaccinated and unvaccinated spread COVID-19.

569. The termination of religious objectors did not further the alleged state interest because the efficacy of the vaccines failed. Defendants knew at the time of the termination that

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

the vaccine was failing, but Defendants purposefully chose to continue with the wrongful termination of religious objectors.

570. Even if the vaccines had worked as promoted, the Defendants failed to utilize a narrowly tailored method to control the spread of virus without considering lesser available means of achieving the alleged objective.

571. Defendants failed to utilize PPE, testing, telework, or natural immunity in stopping the spread of COVID-19, and the method they relied upon – vaccination only – did nothing to stop the spread of the virus, as evidenced by a "cleansed" workforce with high breakthrough numbers of fully vaccinated contracting the virus.

572. Defendants' actions fail strict scrutiny.

573. Defendants' actions would fail even rational-basis review.

574. Additionally, Plaintiffs have been deprived of their right to privacy through the invasive nature of the religious exemption questionnaire which Defendants required them to answer.

575. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**(Violation of Right to be Free from Arbitrary and Capricious Action)**

576. The Plaintiffs here reallege the allegations set forth above in this Complaint.

577. The Plaintiffs have a "fundamental right" "to be free from arbitrary and capricious government action. *Pierce Cty. Sheriff v. Civ. Serv. Comm'n of Pierce Cty.*, 98 Wash.2d 690, 693–94 (1983).

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

578. In light of the CDC's latest guidance, and/or with the current knowledge that the vaccines do not prevent transmission, the "vaccinate or terminate" policy at issue in this case is arbitrary and capricious.

579. Defendants' application of the policy to deny all accommodations without individualized dialogue is arbitrary and capricious.

580. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

581. The Plaintiffs have each been adversely impacted by the Defendants' arbitrary and capricious conduct.

582. The Plaintiffs have been damaged in an amount to be proved at trial.

**TWELVTH CAUSE OF ACTION**
**(Wage Theft)**

583. Plaintiffs here reallege the allegations set forth above in this Complaint.

584. Defendants have, willfully and with the intent to deprive, failed to pay wages to the Plaintiffs since the date of their respective terminations.

585. Defendants had a pre-existing duty under contract to pay Plaintiffs the specific compensation as set forth in their employment contracts.

586. This included a duty to also compensate Plaintiffs for accrued vacation, sick time and leave at the time of termination.

587. Defendants were aware at the time of termination that Plaintiffs were being treated differently than secular and non-medical objectors by requiring religious and medical objectors to receive a vaccine to prevent infection, knowing that both the vaccinated and

**ARNOLD & JACOBOWITZ PLLC**
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

the unvaccinated both contracted and spread the COVID-19 virus equally, and affirmatively elected to ignore the established science.

588. Defendants have authority and control over the employment status and payment of wages to Plaintiffs.

589. Plaintiffs did not knowingly submit to the deprivation of wages.

590. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial, including at least lost wages and lost benefits, including pensions.

591. Defendants' actions are the actual and proximate cause of Plaintiffs' damages.

592. Plaintiffs not yet reinstated are entitled to back wages, and for all Plaintiffs to double damages, costs of suit and reasonable attorney fees, Wash. Rev. Code § 49.52.070.

### THIRTEENTH CAUSE OF ACTION
### (Breach of Contract
### In tort and U.S. Const. Art. I, Sec. 10, Cl. 1;)

593. Plaintiffs here reallege the allegations set forth above in this Complaint.

594. "No State shall enter into any…law impairing the Obligation of Contracts…" U.S. Const. art. I, § 10, cl. 1."

595. There existed a binding contract between each Plaintiff and Defendants that permitted termination only for "just cause."

596. Each Plaintiffs substantially performed their obligations under this contract.

597. Defendants had no basis for a just cause termination. "Just cause is a way of addressing disciplinary acts; and discipline arises when an employer alleges that there was a rule or policy which the [employee] violated or failed to satisfy…. But in the case at hand, [agency] does not allege that [employee] violated any rule or fell short of any policy.

This case springs from Governor's vaccination mandate; and that mandate does not say, 'Be vaccinated or we will let you go.' What it says is, 'Be vaccinated unless you fall under a medical or religious exemption or we will let you go.' There is no dispute that [employee] did not violate that rule." Exhibit BQ at 12.

598. The Defendants breached its contracts with Plaintiffs by terminating them without just cause.

599. Defendants' wrongful termination of Plaintiffs was based on a new condition of employment that was not part of Plaintiffs' contract when hired.

600. A vaccine mandate is a "private, irreversible medical decision made in consultation with private medical professionals outside the federal workplace," and is not a "working condition" of employment. *Feds for Medical Freedom, et al., v. Joseph Biden, et al.,* No. 22-40043, at 14, 28, 30 (5th Cir. March 23, 2023).

601. Defendants' actions violated Plaintiffs' right to continued employment by terminating them without "just cause" and wrongly characterizing that private medical decision made outside the workplace as a new condition of employment without consideration.

602. Defendants' action also violated Plaintiffs' pension rights, likewise, established by contract.

603. Defendants' actions caused a substantial change to the pension rights of Plaintiffs established by Wash. Rev. Code Title 41 *et. seq.*

604. Plaintiffs have suffered extraordinary financial loss because of the substantial change in their pension rights without cause.

605. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

606. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial, including at least lost wages and lost pensions.

### FOURTEENTH CAUSE OF ACTION
### (Public Policy Tort Claim Against Religious Discrimination)

607. The Plaintiffs here reallege the allegations set forth above in this Complaint.

608. The Plaintiffs hold sincere religious beliefs.

609. Defendants acknowledged and accepted the sincerity of the religious beliefs of each Plaintiff.

610. Plaintiffs were each terminated for practicing their religion, which is a legal right of each Plaintiff.

611. Plaintiffs were terminated in retaliation for exercising their religious beliefs.

612. Plaintiffs each had employment agreements that they could only be terminated for just cause.

613. Plaintiffs' terminations violate a precept of public policy that prohibits employment discrimination without just cause.

614. Plaintiffs' each had employment agreements containing express or implied provisions that they would be employed so long as they satisfactorily performed the services expected of them, protecting them from discharge for reasons other than good faith dissatisfaction by the employer.

615. These acts were performed by Defendant Hunter in his individual capacity in furtherance of his religious animus towards each Plaintiff.

ARNOLD & JACOBOWITZ PLLC
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221

616. Each of the Plaintiffs have a tort action for damages to redress injuries and damages caused by their termination and are entitled to judgment, therefore.

### FIFTEENTH CAUSE OF ACTION
### (Subjected to Investigational Drug Use – 42 U.S.C. § 1983)

617. The Plaintiffs here reallege the allegations set forth above in this Complaint.

618. The CDC COVID Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 C.F.R. pt. 46 (2023), the Belmont Report, 21 U.S.C. § 360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, 10 U.S.C. § 980, EUA Scope of Authorization letters, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

619. 45 C.F.R. § 46.116(b)(8) states: "A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."

620. The Belmont Report declares, "An agreement to participate in research constitutes a valid consent only if voluntarily given. This element of informed consent requires conditions free of coercion and undue influence."

621. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — "of the option to accept or refuse administration of the product."

622. Article VII of the ratified International Covenant on Civil and Political Rights (ICCPR) Treaty affirms that "…no one shall be subjected without his free consent to medical or scientific experimentation."

623. Defendants provided the shots to Plaintiffs through but did not provide informed consent to those they mandated the taking of the EUA vaccination.

624. The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, unlawfully subjected Plaintiffs to the use of investigational medical products under threat of penalty outside of their free will and voluntary consent as described in the above facts, thereby causing them damages described *infra*.

## SIXTEENTH CAUSE OF ACTION
### (Unconstitutional Conditions Doctrine – 42 U.S.C. § 1983)

625. The Plaintiffs here reallege the allegations set forth above in this Complaint.

626. The CDC COVID Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 C.F.R. pt. 46 (2023), the Belmont Report, 21 U.S.C. § 360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

627. The courts have long held that an individual "may not barter away his life or his freedom, or his substantial rights." *Insurance Company v. Morse*, 87 U.S. 445 (1874).

628. "It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold. It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon

such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Frost Trucking Co. v. R.R. Com.,* 271 U.S. 583, 593-94 (1926) (emphasis added).

629. Defendants provided the shots to Plaintiffs but did not provide informed consent to those they mandated the taking of the EUA vaccination.

630. The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described *infra.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, and each of them, pray for the following relief against the Defendants:

1. Judgment against all Defendants on all claims.

2. Money judgment for back pay and front pay, loss of benefits, and loss of pension rights, for those Plaintiffs who were terminated or forced to quit.

3. Reinstatement for those Plaintiffs who desire to return to their previous positions.

4. Double damages for lost wages pursuant to Wash. Rev. Code § 49.52.070.

5. Money judgment for all Plaintiffs pursuant to the infringement upon their constitutional and statutory rights.

6. Attorney fees as authorized by State and Federal statute.

7. Such other and further relief that is just and equitable.

DATED this 30th day of January 2024.

**ARNOLD & JACOBOWITZ PLLC**

*s/ Nathan J. Arnold*
Nathan J. Arnold, WSBA #45356
8201 164th Avenue NE, Suite 200
Redmond, WA 98052
(206) 799-4221
Nathan@CAJLawyers.com
*Counsel for Plaintiffs*